UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-21948-CIV-COOKE

KENNETH DOWNER *et al.*,

      Plaintiffs,

vs.

ROYAL CARIBBEAN CRUISES LTD.,

      Defendant.

_____/

**<u>DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO DISMISS</u>**

HOLLAND & KNIGHT LLP
Sanford L. Bohrer (FBN 160643)
Scott D. Ponce (FBN 0169528)
Attorneys for Celebrity
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
(305) 374-8500 (telephone)
(305) 789-7799 (facsimile)

Defendant Royal Caribbean Cruises Ltd. ("Royal Caribbean"), pursuant to 9 U.S.C. §206 and Rule 12(b)(3) of the Federal Rules of Civil Procedure,[1] moves for the entry of an Order compelling arbitration and dismissing Plaintiffs' Complaint in favor of arbitration.  The grounds for this Motion are:

## I.    INTRODUCTION

### A.    Plaintiffs, Their Sign-On Employment Agreements, And The Collective Bargaining Agreements.

This putative class action lawsuit has been brought by eight people[2] who work or worked as stateroom attendants aboard cruise ships operated by Royal Caribbean (Compl., ¶¶8-10).  Stateroom attendants clean passengers' cabins (*Id.*).  Plaintiffs are citizens of Costa Rica, Jamaica, and St. Vincent and the Grenadines (Declaration of Salvatore A. Faso II (Exhibit 1), ¶¶6-8).  Plaintiffs' Complaint relates to the time period from May 27, 2008 through the present (the "Relevant Period") (Compl., ¶20).

Plaintiffs executed Sign-On Employment Agreements ("SOEAs") throughout the Relevant Period (Compl., ¶¶11-12, 31).  The SOEAs (1) set each employee's Monthly Total Guaranteed Pay including Guaranteed Overtime; (2) contain a mandatory arbitration provision; and (3) incorporate the terms of collective bargaining agreements that were negotiated at arms' length by Royal Caribbean and Plaintiffs' union, the Norwegian Seafarers' Union (the "Union").

---

[1] Because "[a]n agreement to arbitrate . . . is, in effect, a specialized kind of forum-selection clause," *see Scherk v. Alberto-Culver Co.*, 417 US 506, 519 (1974), Rule 12(b)(3) is the appropriate vehicle for seeking dismissal on the basis of a contractual arbitration provision.  *See Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1290 (11th Cir. 1998) ("we hold that motions to dismiss on the basis of choice-of-forum . . . clauses are properly brought pursuant to Fed.R.Civ.P. 12(b)(3) as motions to dismiss for improper venue").

[2] Originally there were nine Plaintiffs, but Norris Anthony Smith voluntarily dismissed his claims [DE 6].

Examples of the SOEAs used during the Relevant Period are attached to Mr. Faso's Declaration (Exhibit 1, ¶¶10-12).

The arbitration provisions contained in the SOEAs that were in use from the beginning of the Relevant Period through approximately July 2009 provided that specified disputes "shall be referred to and resolved exclusively by binding arbitration" pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517 (the "Convention"), and its implementing legislation, 9 U.S.C. §§202-208 (the "Convention Act") (Exhibit 1, ¶11). Those agreements did not specify the law to be used in the arbitration (*Id.*).

The arbitration provisions contained in the SOEAs that have been in use from approximately July 2009 through the filing of this Motion also provide that specified disputes "shall be referred to and resolved exclusively by binding arbitration" pursuant to the Convention, and those agreements provide that the law of Norway shall apply to those disputes (Exhibit 1, ¶12; Compl., ¶¶32).

As mentioned above, the SOEAs also expressly incorporate the terms of collective bargaining agreements between Royal Caribbean and the Union: "I further understand and agree that the Collective Bargaining Agreement between the Company and the Union is incorporated into and made part of this Employment Agreement and that I and the Company are bound by its terms and conditions" (Exhibit 1, ¶¶11-12; Compl., ¶33).

Like the SOEAs, the collective bargaining agreements (1) set each employee's Monthly Total Guaranteed Pay including Guaranteed Overtime, and (2) contain mandatory arbitration provisions.  Copies of the collective bargaining agreements that were in effect during the Relevant Period are attached to Mr. Faso's Declaration (Exhibit 1, ¶¶15-17).

The collective bargaining agreement that was in effect from the beginning of the Relevant Period through June 30, 2009 (the "2008 CBA") provides that the specified claims

"shall be referred to and resolved exclusively by binding arbitration" pursuant to the Convention (Exhibit 1, ¶16 (Article 36)).  The 2008 CBA also provides that "the laws of the State of Florida, United States of America shall govern the interpretation of this Agreement" (*Id.*, (Article 37)).

The collective bargaining agreement that has been in effect from July 1, 2009 through the filing of this Motion (the "2009 CBA") provides that the specified claims "shall be referred to and resolved exclusively by mandatory binding arbitration" pursuant to the Convention, and that "[a]ny grievance or other dispute shall be governed in accordance with the laws of Norway, without regard to any conflicts of laws principles" (Exhibit 1, ¶17 (Article 35)).

**B.    The Evolution Of Housekeeping And The Use Of Helpers.**

Also in 2009, Royal Caribbean and the Union executed an amendment to the collective bargaining agreement (the "Amendment") establishing a program called the "Evolution of Housekeeping."  The Amendment also addresses some employees' practice of hiring "helpers;" that is, one employee paying another person to help the employee complete his or her tasks.  The Amendment, a copy of which is attached to Mr. Faso's declaration (Exhibit 1, ¶18), provides:

> Beginning in July of 2009 aboard select vessels, the Company initiated an Evolution of Housekeeping program. As part of this program, Stateroom Attendants aboard the selected vessels are rated and evaluated by fair and objective performance standards established by the Company. These standards may change from time to time at the discretion of the Company.
>
> As a further part of this program, the lower rated Stateroom Attendants, in accordance with the Company standards, are required to rotate to a "Back of House" position where they are required to service staff and officer staterooms. The "Back of House" assignment is intended to provide the lower scoring Stateroom Attendants an on-the-job training opportunity to assist them with reaching the required levels of performance. It is understood that for the period of time that the Stateroom Attendant is working the "Back of House" rotation he or she will only receive gratuities voluntarily paid by staff and officers whose staterooms are being serviced. It is not mandatory for the staff and officers to pay gratuities.
>
> It is agreed and acknowledged that any Stateroom Attendant assigned to the "Back of House" rotation has and will continue to receive the Monthly Total Guaranteed pay amount of $1,050 per month as set forth in the Agreement and the applicable wage table. It is also agreed and acknowledged that any Stateroom Attendant who claims that they have not

received the Monthly Total Guaranteed pay amount must timely submit their claim for any shortfall in accordance with Article 9(E)(8) of the Agreement.

The Union agrees that as long as each Stateroom Attendant receives their Monthly Total Guaranteed pay and/or complies with the Agreement in order to claim a shortfall as to the Monthly Total Guaranteed pay, the Company is and has been in compliance with the Agreement. However, the Union and the Company hereby agree that beginning on October 1, 2010 the Company shall pay a gratuity supplement in the total amount of $10.00 per day for each day a Stateroom Attendant is required to work "Back of House". This gratuity supplement shall be paid even if the Stateroom Attendant has otherwise received the Monthly Total Guaranteed pay and shall apply as income toward the Minimum Total Guaranteed pay. This Amendment to the Agreement is not a reflection that any part of the Agreement was violated before the date of this Amendment to the Agreement, and in fact, the Union and the Company agree that there was no violation since the Monthly Total Guaranteed Pay was at all times paid.

The Union and the Company further agree that the Company has committed to developing a plan to reduce the average number of days a Stateroom Attendant will be assigned on any single "Back of House" rotation.

The Union and the Company also acknowledge that the Company has committed to develop a plan to fund additional assistance for Stateroom Attendant duties through sharing of enhanced gratuities and other personnel rotations. It is acknowledged and agreed that any Stateroom Attendant who, prior to the implementation of any changes regarding gratuities and personnel rotations, paid or pays another person to assist the Stateroom Attendant with his or duties, does so on a voluntary basis and shall not be considered to have been paid or otherwise received less than his or her full wages as a result of having paid another person for such assistance.

## C.    The Nature Of Plaintiffs' Claims.

Plaintiffs' Complaint is premised upon allegations that they were not paid the full amount of wages to which they were contractually entitled.   Plaintiffs' theory regarding why they supposedly were not paid their full wages takes two forms.

First, Plaintiffs allege that Royal Caribbean assigned them an unreasonably large amount of work on embarkation day[3] such that it was impossible for them to timely complete their work without hiring helpers (Compl., ¶16(A)).  Plaintiffs paid the helpers from Plaintiffs' own money,

---

[3]  Embarkation day is the day on which one cruise ends and the next cruise begins.   On embarkation day, the passengers whose cruise is ending leave the ship, and the passengers whose cruise is about to begin board the ship.

4

and Plaintiffs allege that the amount they paid the helpers is the amount by which Royal Caribbean failed to pay them the full amount of wages to which they were entitled (*Id.*).

Second, Plaintiffs allege that the "Evolution of Housekeeping" program discussed above constitutes a failure to pay wages because during the time that stateroom attendants are in the "back of the house" cleaning staff and officers' cabins they do not receive as much in gratuities as they do when they are cleaning passengers' cabins (Compl., ¶16(B)).

Based on those allegations, Plaintiffs' Complaint purports to state claims against Royal Caribbean for: a declaration that the arbitration provisions in the SOEAs and collective bargaining agreements are unenforceable (Count I); unpaid wages and penalty wages under 46 U.S.C. §§10313(f) and (g) (Count II); unpaid wages and penalty wages under 46 U.S.C. §§10504(b) and (c) (Count III); breach of contract (Count IV); breach of the covenant of good faith and fair dealing (Count V); and "forced labor, peonage" under 18 U.S.C. §1595 (Count VI).

The Court should compel the arbitration mandated by the SOEAs and collective bargaining agreements – and dismiss the Complaint in favor of arbitration – because such is required by the Convention and the Convention Act.

## II.      ARGUMENT

### A.      THE CONVENTION REQUIRES ARBITRATION TO BE COMPELLED AND THE COMPLAINT TO BE DISMSSED IN FAVOR OF ARBITRATION.

"The Convention requires that a Contracting State [the United States is a Contracting State] 'shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen . . . between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.'" *See Bautista v. Star Cruises*, 396 F.3d 1289, 1296 (11th Cir. 2005) (quoting the Convention, Article II(1)).

5

In determining whether an arbitration provision must be enforced "under the Convention Act, a court conducts 'a very limited inquiry.'"  *See Bautista*, 396 F.3d at 1294 (quoting *Francisco v. Stolt Achievement MT*, 293 F.3d 270, 273 (5th Cir. 2002)); *see also Lobo v. Celebrity Cruises Inc.*, 488 F.3d 891, 894 n.3 (11th Cir. 2007) (quoting *Bautista*, 396 F.3d at 1294) (same).  The "very limited" nature of this inquiry reflects the fact "that the Convention Act 'generally establishes a strong presumption in favor of arbitration of international commercial disputes.'"  *See Bautista*, 396 F.3d at 1295 (quoting *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1440 (11th Cir. 1998)).

In conducting the requisite, very limited inquiry, courts consider whether the following elements are met:

> an agreement (1) in writing within the meaning of the Convention; (2) that provides for arbitration in the territory of a signatory of the Convention; (3) that arises out of a legal relationship, whether contractual or not, that is considered commercial; and (4) with a party that is not an American citizen, or where the commercial relationship has some reasonable relation with one or more foreign states.

*See Lobo*, 488 F.3d at 894 n.3; *see also Bautista*, 396 F.3d at 1294 n.7 (same); *Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 903 (5th Cir. 2005) (same); *Stolt,* 293 F.3d at 273.

"[T]he Convention *compels* federal courts to direct qualifying disputes to arbitration . . . ." *See Lobo*, 488 F.3d at 895 (emphasis in original).  Put another way, "'[i]f these requirements are met, the Convention requires district courts to order arbitration.'"  *See Stolt*, 293 F.3d at 273 (quoting *Sedco v. Petroleos Mexicanos Mexican Nat'l Oil Co.*, 767 F.2d 1140, 1144-45 (5th Cir. 1985)).   Arbitration should be compelled, and Plaintiffs' Complaint should be dismissed in favor of arbitration, because each element of the Convention is satisfied here.

### 1.      The Agreement To Arbitrate Is In Writing.

The first element focuses upon whether there is an "agreement in writing" to arbitrate, as those terms are used in the Convention.  Article II, section 2 of the Convention provides that

"[t]he term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties . . . ."  *See* 21 U.S.T. 2517.

Plaintiffs concede that they executed SOEAs containing arbitration provisions (Compl., ¶¶31-32; Exhibit 1, ¶¶11-12).  This satisfies the element requiring that the agreement to arbitrate be in writing.  Plaintiffs also concede that their SOEAs expressly incorporated the arbitration provisions contained in the collective bargaining agreements (Compl., ¶¶12, 33-36; Exhibit 1, ¶¶11-12, 16-17).  That, too satisfies this element. *See, e.g., Polychronakis v. Celebrity Cruises Inc.*, 2008 WL 5191104 at *4 (S.D. Fla. 2008) (element satisfied where employment agreement incorporated collective bargaining agreement containing arbitration provision); *Amon v. Norwegian Cruise Lines Ltd.*, 2002 WL 32851545 at * 1 (S.D. Fla. 2002) (same); *Allen v. Royal Caribbean Cruises Ltd.*, 2008 WL 5095412 at *5 (S.D. Fla. 2008) (same); *Hodgson v. Royal Caribbean Cruises Ltd.*, 2009 WL 6364071 at **3-7 (S.D. Fla. 2009) (same); *See Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.2d 440, 450 n.14 (3d Cir. 2003). The "agreement in writing" element is satisfied here.

**2.      Arbitration In The Territory Of A Signatory.**

The second element focuses upon whether the arbitration will be held in the territory of a signatory to the Convention.  In the aggregate, the SOEAs and collective bargaining agreements provide that the arbitration shall take place in the United States, Norway, the vessel's flag state (The Bahamas), or the countries of the Plaintiffs' citizenship (Jamaica, Costa Rica, and St. Vincent and the Grenadines) (Exhibit 1, ¶¶4, 8, 11-12, 16-17).  This element is satisfied because each of those nations is a signatory to the Convention.

**3.      The Agreement Arises Out Of A Commercial Relationship.**

The third element focuses upon whether the agreement "arises out of a legal relationship, whether contractual or not, that is considered commercial."  *See Lobo*, 488 F.3d at 894 n.3; *see*

7

*also Bautista*, 396 F.3d at 1294 n.7.   Seamen employment contracts, and the arbitration provisions contained in those contracts, are "commercial legal relationships within the meaning of the Convention Act."  *See Bautista*, 396 F.3d at 1300; *see also Lobo*, 488 F.3d at 895 n.5; *Stolt*, 293 F.3d at 274; *Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1154-55 (9th Cir. 2008).  This element is satisfied.

### 4. A Party Is Not An American Citizen, And There Is A Reasonable Relation With One Or More Foreign States.

The fourth element requires that at least one party not be an American citizen, <u>or</u> that the commercial relationship have some reasonable relation with one or more foreign states. Neither Plaintiffs nor the Union are American citizens, thus satisfying this element irrespective of whether Royal Caribbean is an American citizen.  Additionally, there can be no question that the relationship documented and memorialized in the collective bargaining agreement – service aboard a foreign flagged vessel traveling in international waters and visiting foreign ports – has a reasonable relation with one or more foreign states, thus satisfying this element even if all the parties were American citizens.  *See, e.g., Freudensprung v. Offshore Technical Services*, 379 F.3d 327, 339-41 (5th Cir. 2004). This element is satisfied.

In sum, all of the elements of the Convention are met here, which means arbitration must be compelled – and the Complaint dismissed in favor arbitration – because "the Convention *compels* federal courts to direct qualifying disputes to arbitration."  *See Lobo*, 488 F.3d at 895 (emphasis in original).

## B. THE CONVENTION'S PUBLIC POLICY DEFENSE DOES NOT APPLY HERE.

As telegraphed in Count I of the Complaint, Plaintiffs will argue that, under *Thomas v. Carnival Corp.*, 573 F.3d 1113 (11th Cir. 2009), the Convention's public policy defense (set out in Article V(2)(b) of the Convention) bars enforcement of the arbitration provision contained in

the 2009 CBA.  Specifically, Plaintiffs will argue that because the arbitration provision in the

2009 CBA requires the arbitrator to apply the laws of Norway, Plaintiffs will not be permitted to

pursue U.S. statutory claims and thus enforcement of the arbitration provision – as it relates to

the statutory claims alleged in Counts II, III, and VI – violates the public policy of the United

States.[4]  This argument fails.

### 1.      Thomas Is Inapposite As A Matter Of Law And Fact.

In *Thomas*, the plaintiff-seaman's employment contract contained an arbitration provision

providing that specified claims "shall be resolved [ ] in accordance with the laws of the flag of

the vessel on which the Seafarer is assigned at the time the cause of action accrues," which

meant the law of Panama would apply because the vessel flew a Panamanian flag of

convenience.  *See Thomas*, 573 F.3d at 1123.   Nothing in *Thomas* provides or suggests that the

plaintiff was represented by a union, was the beneficiary of collective bargaining or a collective

bargaining agreement, or otherwise participated in the selection of Panamanian law.  In fact, the

plaintiff in *Thomas* was not represented by a union, was not the beneficiary of collective

bargaining or a collective bargaining agreement, and the employer/cruise line unilaterally

selected Panamanian law.

The Eleventh Circuit ruled that because the arbitrator would be required to apply

Panamanian law, and because Panamanian law would not recognize the plaintiff's statutory claim

under 46 U.S.C. §10313, enforcement of the arbitration provision would violate the public policy

of the United States.  *See id.* at 1123-24.   The decision in *Thomas* was premised upon the

following dictum from the United States Supreme Court:

---

[4] This argument cannot be made in connection with the 2008 CBA because that agreement calls
for the application of U.S. law.

> We merely note that in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue remedies for anti-trust violations, we would have little hesitation in condemning the agreement as against public policy.

*See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985);[5]

*see also Thomas*, 573 F.3d at 1121 (quoting *Mitsubishi*, 473 U.S. at 637 n.19).  The facts and circumstances at issue in *Thomas* – which the Eleventh Circuit found sufficient in that action to justify reliance on the dictum from *Mitsubishi* – simply do not exist here.

Plaintiffs are citizens of Jamaica, Costa Rica, and St. Vincent and the Grenadines (Exhibit 1, ¶8).  Plaintiffs are represented by the Union, which is based in Norway and has existed since 1910 (*Id.*, ¶¶13-14).  The Union's collective bargaining agreements cover seafarers working on more than 1,600 ships (*Id.*, ¶¶14). The Union is affiliated with the International Transport Workers' Federation, which is a federation of 570 transport trade unions in 132 countries, representing approximately 5 million workers (*Id.*).

On behalf of its members – including Plaintiffs – the Union has engaged in collective bargaining with Royal Caribbean (*Id.*, ¶¶14-15).  One of the results of the collective bargaining process was the 2009 CBA, which Plaintiffs are seeking to enforce in this action (*Id.*, ¶¶15, 17).  As part of the collective bargaining process leading to that agreement – a process during which the Union and Royal Caribbean were represented by counsel – Norwegian law was selected to apply to claims such as the ones asserted here (*Id.*).  Norwegian law was selected at the Union's request because it is the law of the Union's home country, and the Union is satisfied that Norwegian law fully protects the rights of its members (*Id.*, ¶17).

---

[5] The dictum in footnote 19 of *Mitsubishi* has been repeated by the Supreme Court twice and, on each occasion, was repeated in dictum.  *See Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 540 (1995); *14 Penn Plaza LLC v. Pyett*, __ U.S. __, 129 S.Ct. 1456, 1474 (2009).  The Supreme Court has never used this language to invalidate an arbitration provision.

Thus, the international relationship at issue here involves (1) an employer that is a Liberian corporation having its principal executive offices in Miami, Florida, (2) employees who are citizens of Jamaica, Costa Rica, and St. Vincent and the Grenadines, (3) a Norwegian union, and (4) employees working aboard Bahamian flagged vessels travelling in international waters and visiting ports throughout the world (Exhibit 1, ¶¶3, 4, 8, 14).  In the midst of all of those international connections,[6] the parties chose Norwegian law (the law of the Union's home country) as the law to be applied by an arbitrator.  That is the type of decision – made in the type of circumstances – that the United States Supreme Court has held should be enforced and *not* cast aside simply because the United States' laws will not govern the dispute:

> In this case, by contrast, in the absence of the arbitration provision considerable uncertainty existed at the time of the agreement, and still exists, *concerning the law applicable to the resolution of disputes arising out of the contract*.

> Such uncertainty will almost inevitably exist with respect to any contract touching two or more countries, each with its own substantive laws and conflict-of-laws rules.  A contractual provision specifying in advance the forum in which disputes shall be litigated *and the law to be applied* is, therefore, almost an indispensible precondition to achievement of the orderliness and predictability essential to any business transaction.  Furthermore, such a provision obviates the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved.

> A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages.  In the present case, for example, it is not inconceivable that if Scherk had anticipated that Alberto-Culver would be able in this country to enjoin resort to arbitration he might have sought an order in France or some other country enjoining Alberto-Culver from proceeding with its litigation in the United States.  Whatever recognition the courts of this country might ultimately have granted to the order of the foreign court, the dicey situation of such a legal no-man's-land would surely damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements.

---

[6] "We think it is clear that the agreement in this case is 'truly international,' as that term was used in *Scherk* . . . ." *See Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1293 n.14 (11th Cir. 1998) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 517, 519 (1974)).

\* \* \*

An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute. The invalidation of such an agreement in the case before us would not only allow the respondent to repudiate its solemn promise but would, as well, reflect a "parochial concept that all disputes must be resolved *under our laws* and in our courts. . . . We cannot have trade and commerce in world markets and international waters *exclusively on our terms, governed by our laws*, and resolved in our courts."

*See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 517, 519 (1974) (quoting *The Bremen v. Zapata Offshore Co.*, 407 U.S. 1, 9 (1972)) (emphasis added) (ellipses in original); *see also Lipcon v. Underwriter's at Lloyd's London*, 148 F.3d 1285, 1294-95 (11th Cir. 1998):

To conclude that the anti-waiver provisions of the United States securities laws categorically preclude sophisticated parties from entering into international agreements – agreements that by definition involve parties and subject matter that would be subject to the laws of more than one nation if the parties did not contract *ex ante* for provisions governing choice of law and choice of forum – would undermine both policies upon which *Bremen* and *Scherk* were based.

If applied here, the effect of *Thomas* would be a *per se* rule invalidating as violative of public policy *any* arbitration agreement that, through its selection of foreign law, prevents a plaintiff from asserting a U.S. statutory cause of action regardless of its merit or lack thereof. Such a result, however, conflicts with the holding in *Scherk* that international arbitration agreements cannot be invalidated on the basis that they provide for the application of something other than "our laws." *Thomas* did not address *Scherk*, and it had no occasion to do so because the only reference to *Scherk* in the parties' briefs was as part of a parenthetical citation at page 13 of the cruise line's answer brief (Exhibit 2).

Put simply, this is not *Thomas*, where an employee, who was not represented by a union, signed a contract with a multinational corporation in which the corporation unilaterally selected Panamanian law to govern all disputes, with Panama's only connection to the relationship being that the corporation chose to register its vessels there. That scenario stands in sharp contrast to

12

the circumstances here, where Plaintiffs were represented by a Union that is part of an international federation of unions, and the Union negotiated a collective bargaining agreement selecting the laws of its home country as the applicable law.   Replacing the Norwegian Union's determination of how best to protect its international seafaring members with an American court's parochial views on whether foreign seafarers are adequately protected if they cannot assert U.S. statutory claims is precisely what *Scherk* prohibits.  *See Scherk*, 417 U.S. at 517, 519; *see also Bautista v. Star Cruises*, 396 F.3d 1289, 1300 (11th Cir. 2005) (citing and quoting *Scherk*, 417 U.S. at 520 n.15) ("In pursuing effective, unified arbitration standards, the Convention's framers understood that the benefits of the treaty would be undermined if domestic courts were to inject their 'parochial' values into the regime . . . ."). *Thomas* cannot be applied here.

### 2.      Plaintiffs Do Not Have Viable Statutory Claims.

Even if *Thomas* could be applied here, its application would not warrant invalidation of the arbitration provision contained in the 2009 CBA.  Where *Thomas* applies, it invalidates arbitration provisions that deprive plaintiffs of the ability to assert U.S. statutory claims. Plaintiff's Complaint purports to state "statutory claims" for unpaid wages and penalty wages under 46 U.S.C. §§10313 and 10504 (Counts II and III, respectively), and for "forced labor, peonage" under 18 U.S.C. §1595.  Because those claims are not viable, however, enforcement of the arbitration provisions will not deprive Plaintiffs of U.S. statutory claims.  Put another way, a plaintiff cannot circumvent a contractual choice of law provision simply by pleading meritless statutory claims based on the laws of a country other than the country whose laws were selected in the contract. *See, e.g., Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir. 1993):

It defies reason to suggest that a plaintiff may circumvent forum selection and arbitration clauses merely by stating claims under laws not recognized by the forum selected in the agreement.  A plaintiff simply would have to allege violations of his country's tort law or

13

his country's statutory law or his country's property law in order to render nugatory any forum selection clause that implicitly or explicitly required the application of the law of another jurisdiction.  We refuse to allow a party's solemn promise to be defeated by artful pleading.

*Haynsworth v. The Corp.*, 121 F.3d 956, 969 (5th Cir. 1997) (adopting *Roby*, 996 F.2d at 1360) (same); *Bonny v. Society of Lloyd's*, 3 F.3d 156, 162 (7th Cir. 1993) (citing *Hugel v. Corporation of Lloyd's*, 999 F.2d 206 (7th Cir. 1993) and *Roby*, 996 F.2d at 1360) (adopting *Roby*) (same); *Shell v. R.W. Sturge, Ltd.*, 55 F.3d 1227, 1230-31 (6th Cir. 1995) (citing *Scherk*, 417 U.S. at 516-17; *Roby*, 996 F.2d at 1360) (adopting *Roby*) (same).

       i.       Plaintiffs Do Not Have Claims For Penalty Wages, and Norwegian Law Provides A Complete Remedy For Unpaid Wages.

Title 46 U.S.C. §§10313 and 10504 are separate provisions of the Seaman's Wage Act. Section 10313 relates to foreign voyages, and §10504 relates to coastwise voyages.  *See Kurtz v. Commissioner of Internal Revenue*, 575 F.3d 1275, 1279 (11th Cir. 2009); 46 U.S.C. §§10301(a) and 10501(a).  In the Complaint, Plaintiffs are suing for unpaid wages under §§10313(f) and 10504(b), and also for penalty wages under §§10313(g) and 10504(c).  Enforcing the arbitration provision will not deprive Plaintiffs of U.S. statutory claims for the purposes of *Thomas* because Plaintiffs do not have claims for penalty wages, and Norwegian law provides a complete remedy for unpaid wages.

At the outset, Plaintiffs have ***no*** claims under §10504 – for either unpaid wages or penalty wages – because they did not work on coastwise voyages.  A "coastwise voyage" is a "voyage between a port in one State and a port in another State (except an adjoining State)."  *See* 46 U.S.C. §10501(a).  No Royal Caribbean cruise is wholly within the United States; each visits foreign ports because the purpose of the cruises is to take passengers to foreign ports, not to transport them between United States ports, which means Plaintiffs never worked aboard a coastwise voyage.  *See* Exhibit 1, ¶5; *The Granada*, 35 F.Supp. 892, 894 (E.D. Pa. 1940) ("The

14

object in the transportation of the passengers of the Granada was to afford them a cruise to a foreign port, not to engage in commerce between United States ports."); *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1289 (11th Cir. 2000) ("The Champion traveled from Mississippi to Connecticut – a coastwise voyage.").

Indeed, even if Plaintiffs could somehow establish that Royal Caribbean is engaging in coastwise voyages, their claim under §10504 would nonetheless fail because transporting passengers between states is "coastwise commerce," and the unpaid wage and penalty wage provisions of §10504(b) and (c) do ***not*** apply to "a vessel engaged in coastwise commerce." *See* 46 U.S.C. §10504(d)(1); *see also Kirby*, 205 F.3d at 1289 and n.9 (11th Cir. 2000):

> The Champion engaged in commerce because it transported heating oil between Mississippi and Connecticut. Thus, the district court correctly held that Championship engaged in coastwise commerce.
>
> *   *   *
>
> We note that there may be instances in which a vessel is on a coastwise voyage, but not engaged in commerce, and accordingly, not engaged in coastwise commerce. However, we believe that such a situation would arise rarely, if at all, and perhaps this is a distinction without a difference.

*Powell v. Global Marine, LLC*, 671 F.Supp.2d 830, 837 (E.D. La. 2009) (citing *Kirby*, 205 F.3d at 1289 n.9):

> Furthermore, the "coastwise commerce" exemption to domestic voyages makes the application of the double-wage provision rare. Here, plaintiffs were seamen on the relatively brief voyage between the United States and the Caribbean that contained numerous opportunities for reaching ports and thus was historically exempted from the scope of the double-wage provision. (internal citation omitted).

Moving beyond that, and even if §10504 did apply, Plaintiffs do not have viable claims for penalty wages under §§10313(g) and 10504(c) because they cannot meet the requirement that any failure to pay wages was "without sufficient cause."

15

"The phrase, 'without sufficient cause' . . . means more than the absence of a valid defense to the claim for wages. Otherwise, it adds nothing to the meaning of the statute. In other words, a wrongful withholding alone does not establish the absence of sufficient cause." *See Larkins v. Hudson Waterways Corp.*, 640 F.2d 997, 999 (9th Cir. 1981) (internal citation omitted); *see also Chretien v. Exxon Co., U.S.A.*, 863 F.2d 182, 184 (1st Cir. 1988) (quoting *Larkins*, 640 F.2d at 999) (same); *Swain v. Isthmian Lines, Inc.*, 360 F.2d 81, 83 n.5 (3d Cir. 1966) ("It is well settled that the mere existence of an unlawful withholding does not, in and of itself, establish the absence of sufficient cause for that withholding."); *Henry v. S/S Bermuda Star*, 863 F.2d 1225, 1241 n.70 (5th Cir. 1989) ("We do caution at this juncture that the double wage penalty is not triggered merely by a wrongful withholding.").

> [Without sufficient cause], in effect, is a willful, unreasonable and arbitrary attitude on the part of the master or shipowner in refusing to pay earned wages to the seamen. It may be a high-handed or capricious action, although not necessarily so. "Without sufficient cause" has been characterized by admiralty courts as arbitrary, unwarranted, unjust, and unreasonable conduct.

> The presence of good faith or moral justification for refusal to pay undoubtedly has considerable effect in the determination of whether the master's or shipowner's action was or was not "without sufficient cause." Generally where the refusal or failure to pay wages results from an honest difference of opinion arising from a matter in dispute – a dispute about which honest men are apt to differ – the courts will be loathe to declare a penalty when later one of the disputants has been proved wrong.

> \* \* \*

> [a] showing of good faith upon the part of the master or owner, together with reasonable cause for failure to pay wages due, undoubtedly carries considerable influence in determining whether such refusal is without sufficient cause. Where the master or owner has acted in a reasonable manner throughout and without any showing of arbitrariness or unjustness, where he had an honest doubt as to the justification of the demand, and where the facts and circumstances surrounding the wage demand are susceptible to an honest doubt as to the justness of the seaman's demand, it cannot be said that the refusal is without sufficient cause.

*See Mateo v. M/S Kiso*, 41 F.3d 1283, 1289-90 (9th Cir. 1994) (quoting 1 Martin J. Norris, *The Law of Seamen* §17:5, at 517-19, 17:6, at 519 (4th ed. 1985)); *see also McCrea v. United States*,

294 U.S. 23, 30 (1935) ("The statute thus confers no right to recover double wages where the delay in payment of wages was not in some sense arbitrary, willful, or unreasonable."); *Collie v. Ferguson*, 281 U.S. 52, 55-56 (1930); *Vinieris v. Byzantine Maritime Corp.*, 731 F.2d 1061, 1063-64 (2d Cir. 1984) ("Before Vinieris could recover under this section, therefore, there had to be a showing of 'conscious misconduct' on the part of the ship's Captain, conduct by the Captain which was arbitrary, unwarranted, unreasonable, unjust, and willful.") (internal citations omitted); *Chretien*, 863 F.2d at 184 (quoting *McCrea*, 294 U.S. at 30) ("Besides being contrary to law, a withholding must also be 'arbitrary, willful or unreasonable.'"); *Glandzis v. Callinicos*, 140 F.2d 111, 115 (2d Cir. 1944) ("It is not every refusal which grounds the penalty.  It is arbitrary, unwarranted, and unjust conduct which is sought to be penalized."); *Larkins*, 640 F.2d at 999 ("The penalty is assessed only when the delay in payment is somehow arbitrary or unreasonable.").

Plaintiffs' theory in Counts II and III is that Plaintiffs were not paid their full wages, thus warranting penalty wages, because (a) Plaintiffs hired helpers on embarkation day and paid the helpers from Plaintiffs' own money, and (b) stateroom attendants working in the "back of the house" under the "Evolution of Housekeeping" initiative receive less in gratuities than they would receive if they were cleaning passengers' staterooms (Compl., ¶¶16, 53, 66).  Neither set of allegations supports a finding of "without sufficient cause" because each is expressly permitted by the collective bargaining agreements.

With respect to helpers, the Amendment provides that anyone who hired a helper did so "on a voluntary basis and shall not be considered to have been paid or otherwise received less than his or her full wages as a result of having paid another person for such assistance" (Exhibit 1, ¶18).  With respect to the Evolution of Housekeeping, the Amendment sets up the process and provides that is in accordance with the collective bargaining agreements (*Id.*).   Under the

17

decisions cited above, conduct that is expressly authorized by, and carried out in accordance with, a collective bargaining agreement cannot be considered "without sufficient cause." Plaintiffs do not have claims for penalty wages.

When stripped of penalty wages, Counts II and III are reduced to nothing more than claims seeking compensatory damages for unpaid wages under §§10313(f) and 10504(b). Norwegian law provides for the complete recovery of compensatory damages for unpaid wages; thus, *Thomas* does not require the invalidation of the arbitration provisions because Norwegian law will be "at least as favorable" to Plaintiffs as §§10313(f) and 10504(b).  *See Thomas*, 573 F.3d at 1122, 1123, n.16 (quoting *Fireman's Fund Ins. Co. v. Cho Yang Shipping Co.*, 131 F.3d 1336, 1340 (9th Cir. 1997)).

For example, Norway's Seamen's Act of 30 May 1975 No. 18 ("the Seaman's Act") regulates the employment relationship between ship owners and seafarers and provides minimum requirements for, among other things, employment contracts, the right to leave of absence, employment protection, dismissal, redundancy, and summary dismissal (Declaration of Eli Aasheim (Exhibit 3), ¶5).   Apart from the Seaman's Act, Norway's laws provide for the enforcement of collective bargaining agreements and the terms of those agreements relating to wages (*Id.*, ¶¶6, 8, 12).   Norwegian law recognizes a seafarer's claims for unpaid wages owed under collective bargaining agreements, and allows the seafarer to claim full compensation for any wages, supplements, overtime, or fringe benefits that have not been paid (*Id.*, ¶12). Norway's statutes also allow a prevailing seafarer to recover interest and costs (*Id.*, ¶¶13-14).

Enforcement of the arbitration provision in the 2009 CBA will not deprive Plaintiffs of U.S. statutory claims.

<u>ii.      Plaintiffs Do Not Have A Claim For Forced Labor, Peonage</u>

Count VI purports to state a claim under 18 U.S.C. §1595 for "forced labor, peonage." The United States' statutes relating to peonage were enacted in connection with the adoption of the Thirteenth and Fourteenth Amendments to implement the abolition of slavery following the Civil War. *See, e.g., Clyatt v. United States*, 197 U.S. 207, 216-219 (1905). Plaintiffs' attempt to liken their employment with Royal Caribbean to the horrific enslavement of African Americans not only fails as a matter of law, but is the type of baseless, vexatious, and bad faith conduct that warrants the imposition of sanctions under Rule 11 and the Court's inherent authority.

At the outset, Plaintiffs apparently chose not to alert the Court to decisions holding that peonage laws are historically *not* applicable to seamen. *See, e.g., Robertson v. Baldwin*, 165 U.S. 275, 281-88 (1897); *Clyatt*, 197 U.S. at 215-16 (citing *Robertson*, 165 U.S. 275). Regardless, Plaintiffs do not seem to understand what peonage is: "It may be defined as a status or condition of compulsory service, based upon the indebtedness of the peon to the master. The basal fact is indebtedness." *See Clyatt*, 197 U.S. at 215. Here, Plaintiffs do not and cannot allege that they came to work for Royal Caribbean – or remain working for Royal Caribbean – because they owe debts to Royal Caribbean.

Indeed, even if Plaintiffs were working for Royal Caribbean in order to pay off debts, the peonage laws still would not apply because unlike a "peon," "a "debtor, though contracting to pay his indebtedness by labor or service, and subject, like any other contractor, to an action for damages for breach of that contract, can elect at any time to break it, and no law or force compels performance or a continuance of the service." *See id.* at 215-16. Again, Plaintiffs do not and cannot allege that they are unable to "elect at any time" to stop working for Royal Caribbean, or that some "law or force" would compel them to continue working for Royal

Caribbean against their will.  As the passage just quoted makes clear, that Plaintiffs could be subject to a claim for breach of contract if they quit their jobs is not enough.

It becomes even worse for Plaintiffs, though.  The statute upon which they are attempting to proceed – 18 U.S.C. §1595 – provides civil remedies for violations of §§1581-1593A, but Plaintiffs do not and cannot allege that Royal Caribbean violated any of those statutes.  For example, to the extent Plaintiffs' repeated references to peonage are intended to be references to §1581, Plaintiffs do not and cannot allege that Royal Caribbean "'intentionally held a person against his or her will and coerced that person in order to satisfy a debt by (1) physical restraint or force, (2) legal coercion, or (3) threats of legal coercion or physical force.'"  *See United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010) (quoting *United States v. Farrell*, 563 F.3d 364, 372 (8th Cir. 2009)).

Similarly, Plaintiffs do not and cannot allege that Royal Caribbean is operating vessels for the slave trade (§§1582 and 1586-1588), abducting or enticing people into slavery (§1583), selling people into involuntary servitude (§1584), seizing, detaining, transporting, or selling slaves (§1585), obtaining labor by means of actual or threatened physical force, or the "use or abuse of law or legal process" (§1589), human trafficking (§1590); trafficking children for the sex trade (§1591), or taking permanent possession of or destroying passports and travel documents to render slaves unable to leave (§1592).  Plaintiffs do not have a claim for "forced labor, peonage," and enforcement of the arbitration provision contained in the 2009 CBA will not deprive them of U.S. statutory claims because Plaintiffs have no such claims.

### III.   CONCLUSION

For these reasons, arbitration should be compelled, and Plaintiffs' Complaint should be dismissed in favor of arbitration.

Respectfully submitted,

HOLLAND & KNIGHT LLP
Attorneys for Royal Caribbean
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
(305) 374-8500 (telephone)
(305) 789-7799 (facsimile)


By: /s/ Scott D. Ponce
Sanford L. Bohrer (FBN 160643)
Scott D. Ponce (FBN 0169528)
Email: sbohrer@hklaw.com
Email: sponce@hklaw.com


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 28th day of June 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System.


s/ Scott D. Ponce

#10413989_v1