# EXHIBIT D

## To Faso Declaration

November 14, 2007

# AGREEMENT

# BETWEEN

# ROYAL CARIBBEAN CRUISES LTD.

# AND

# NORWEGIAN SEAFARERS' UNION

# FOR

## MARINE OFFICERS
## AND
## DECK & ENGINE RATINGS
## AND
## RIDING CREW
## AND
## HOTEL PERSONNEL

## SERVING ON CRUISE VESSELS
## UNDER THE
## ROYAL CARIBBEAN INTERNATIONAL
## BRAND

### Effective January 1, 2008

I



November 14, 2007

# INDEX

Article  1 --   Application
Article  2 --   Employment Commencement Expenses
Article  3 --   Duration of Employment
Article  4 --   Termination of Employment
Article  5 --   Pay and Working Hour Rules
Article  6 --   Work and Pay of Marine Officers with totally Consolidated Wages
Article  7 --   Work and Pay of Marine Officers with partially Consolidated Wages
Article  8 --   Working Hours and Pay of Deck and Engine Ratings and Riding Crew
Article  9 --   Working Hours and Pay of Hotel Personnel
Article 10 --   Onboard Luggage Delivery
Article 11 --   Social Program Compensation
Article 12 --   Retirement Plan
Article 13 --   Allotments
Article 14 --   Bank Transfers
Article 15 --   Repatriation
Article 16 --   Compassionate Leave
Article 17 --   Fair Treatment Polices
Article 18 --   Fire Squads and Mobile Groups
Article 19 --   Manning
Article 20 --   Rest Period
Article 21 --   Teaching and Training
Article 22 --   Transfer of Seafarers
Article 23 --   Cargo Handling
Article 24 --   Medical Attention
Article 25 --   Sickness, Injury and Sick Pay
Article 26 --   Paid Leave
Article 27 --   Maternity
Article 28 --   Loss of Life in Service
Article 29 --   Disability
Article 30 --   Crew's Effects
Article 31 --   Seafarer Food, Accommodation, and Amenities
Article 32 --   Service in Warlike Operations Areas
Article 33 --   Insurance Cover
Article 34 --   Union Fees, Welfare Fund and Representation of Seafarers
Article 35 --   Statement of Fair Treatment, Grievance and Dispute Resolution Procedure
Article 36 --   Arbitration Procedure
Article 37 --   Construction
Article 38 --   Amendments to and Duration of the Agreement

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008

DCT
LEGAL

November 14, 2007

## Article 1 -- Application

A)   This Collective Bargaining Agreement ("the Agreement") between Royal Caribbean Cruises Ltd. and RCL (UK) Ltd. (herein after called "the Owners/Company") and the Norwegian Seafarers' Union (herein after called "the Union") sets out the standard terms and conditions applicable to all Marine Officers and Deck and Engine Ratings, Riding Crew and Hotel Personnel (hereinafter called "Seafarers") employed on board vessels operated by the Royal Caribbean International brand.

B)   This Agreement is applicable and of full force and effect whether or not the Owners/Company have entered into individual contracts of employment ("the Employment Agreement") with any Seafarer.

C)   The Seafarers who are covered by the Agreement, the Union, and the Owners/Company shall refrain from strikes, work slow downs, lockouts and similar action at seas and in ports during the length of this contract.

D)   The Owners/Company is obligated to employ the Seafarers on the terms and conditions of this Agreement, and to enter into individual Employment Agreements with each Seafarer which incorporates or refers to the terms and conditions of this Agreement.

E)   A Seafarer to whom this Agreement is applicable, in accordance with Article 1.a. above, shall be covered by the Agreement with effect from the date on which the Seafarer signs on or the date from which this Agreement is effective as applicable, whether the Seafarer has signed the Ship's Articles or not, until the date on which the Seafarer signs off and/or the date until which, in accordance with this Agreement, the Owners/Company is liable for the payment of wages, whether or not the Employment Agreement is executed between the Seafarer and the Owners/Company and whether or not the Ship's Articles are endorsed or amended to include the terms of this Agreement.

## Article 2 -- Employment Commencement Expenses

A)   Expenses in connection with commencement of service on board shall be paid by the Owners/Company, except with respect to travel expenses for Hotel personnel in Group C.

B)   Traveling expenses paid by the Owners/Company shall not include the Seafarer's baggage in excess of the normal weight allowed by the air carrier.  Any such

3



November 14, 2007

excess baggage shall be paid for by the Seafarer. The traveling expenses consist of airfare, train fare, bus fare, reasonable taxi fare, hotel expenses, and food expenses via gateway cities and itineraries in accordance with the Owners/Company's Travel Policy and listed in the Human Resources Office on board.

C)    The Seafarers is required to maintain and renew his or her medical certificate at the Seafarer's expense. Before signing on a ship for a new service period, the Seafarer will ensure that his or her medical certificate is valid for at least the length of the expected service period. The Seafarers shall obtain physicals as requested by the Owners/Company at medical facilities designated by the Owners/Company.

D)    Seafarers are required to maintain their licenses/certificates in order and up to date as well as to pay for any renewal or yearly dues on same. Seafarers shall provide proof from a competent local authority in his home country that he has never been convicted of a felony or comparable serious crime.

E)    Seafarers shall pay the cost for the United States C1/D Visa. The Owners/Company shall pay the cost of any itinerary driven visas.


## Article 3 -- Duration of Employment

A)    The Seafarer shall sign an Employment Agreement for a specific period ("the Service Period") not to exceed ten (10) months. The length of the Service Period is to be decided by the Owners/Company. The Service Period is an expectation of length of employment, not a contractual right, since the Owners/Company may terminate the Employment Agreement prior to the expiration of the Service Period without cause or notice, ref. Article 4.b. The Employment Agreement shall be automatically terminated in accordance with the terms of this Agreement at the first arrival of the Ship in port after the maximum ten (10) months' Service Period.

B)    <u>New Hires:</u>    The first ninety (90) days of service shall be considered a Probationary Period, which entitles the Owners/Company or its representative, i.e. the Master of the vessel, to terminate the Employment Agreement with or without cause effective immediately. In such cases, the Seafarer shall only be entitled to pay through the date of termination. The Probationary Period shall not apply to Seafarers previously engaged by the Owners/Company within one (1) year prior to being rehired.

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008



November 14, 2007

C) <u>Promotions:</u>   The first ninety (90) days of service after a promotion shall also be considered a Probationary Period, which entitles the Owners/Company or its representative, i.e. the Master of the vessel, to reduce the rank of the Seafarer to the Seafarer's previous position or to terminate the Employment Agreement with or without cause.

D) During the probation period, the Seafarer may terminate the Employment Agreement by giving seven (7) days notice.  If the Employment Agreement is terminated by the Seafarer, the Seafarer must pay the Owners/Company all expenses associated with the Seafarer's repatriation.

E) If the Employment Agreement is terminated by the Owners/Company within the probationary period, the repatriation costs must be paid by the Owners/Company.

## Article 4 -- Termination of Employment

A) The Seafarer shall be entitled to terminate the Employment Agreement:

1) if the termination is as a result of the expiration of an agreed Service Period. Ref. Article 3;

2) during the Probationary Period without cause or notice; but if the Seafarer fails to provide seven (7) days notice, the Seafarer will not be eligible for re-hire;

3) by giving seven (7) days' written notice;

4) if the vessel is due to sail into a warlike operations area as defined by Lloyd's;

5) if the Ship is certified substandard in relation to the applicable provisions of the Safety of Life at Sea Convention (SOLAS) 1974, the International Convention on Loadlines (LL) 1966, the Standards of Training Certification and Watchkeeping Convention (STCW) 1978 as amended in 1995 and later, the International Convention for the Prevention of Pollution from Ships 1973, as modified by the Protocol of 1978 (MARPOL) or substandard in relation to ILO Convention No. 147, 1976, Minimum Standards in Merchant Ships, as supplemented by the Protocol of 1996, and remains so for a period of thirty (30) consecutive days

5



November 14, 2007

provided that adequate living conditions and provisions are provided onboard or ashore.

6)   If the Seafarer terminates the Employment Agreement before the expiration of the service period, the Seafarer shall pay for the necessary travel expenses.

B)   The Owners/Company shall be entitled to terminate the Employment Agreement without reason:

1)   <u>Marine Officers</u>: By giving seven (7) days' advance written notice of termination or seven (7) days' Monthly Total Pay in lieu of notice.

2)   <u>Deck and Engine Ratings & Riding Crew</u>: By giving seven (7) days' advance written notice of termination or seven (7) days' Monthly Total Pay in lieu of notice.

3)   <u>Hotel Personnel</u>: By giving seven (7) day's advance written notice of termination or seven (7) days Monthly Total Guaranteed Pay in lieu of notice;

4)   In the event that neither seven (7) days' advance notice nor seven (7) days' payment in lieu of notice has been given, then the Seafarer shall be entitled to:

5)   <u>Marine Officers</u>: Payment of two (2) month's Monthly Total Pay within two (2) months of the termination date.

6)   <u>Deck and Engine Ratings & Riding Crew</u>: Payment of two (2) months Monthly Total Pay within two (2) months of the termination date.

7)   <u>Hotel Personnel</u>: Payment of two (2) months Monthly Total Guaranteed Pay.

C)   The Owners/Company shall be entitled to terminate the Employment Agreement of any Seafarer immediately (without notice) and shall be obligated to pay the Seafarer only through the date of termination, if the termination is a result of any of the following;

1)   if the termination is as a result of the expiration of the expected Service Period;

2)   the termination is taking place during the Probationary Period;

6



November 14, 2007

3) the termination is as a result of notice given by the Seafarer, ref. Article 4.

4) the Seafarer is lawfully and properly dismissed as a consequence of the Seafarer's own misconduct, such as but not limited to, violating the Drug and Alcohol Policy (Annex 5) or the Policy Prohibiting Harassment, the Policy Prohibiting Inappropriate Guest Interaction or the Zero Tolerance Policy on Crime (Annex 6).

D) Termination when misconduct is alleged:

1) Upon the misconduct of a Seafarer giving rise to a lawful entitlement to dismiss, the Owners/Company shall, prior to dismissal hold a hearing before a Committee consisting of at least three members with the Master as Chairman and the Chief Engineer, Staff Captain and/or General Manager/Hotel Director as the other members. In addition to the above members there should be another member appointed by the Seafarer from among the remaining crew.

2) In special cases, the Committee may be appointed by the Owners/Company and the hearing held ashore if considered necessarily in order to best evaluate the factual basis for the dismissal.

3) The Master shall question the Seafarer and any witnesses who might be able to provide information in the case. The remaining members of the committee and the Seafarer may ask questions either through the Master or directly with the Master's consent. If the Master makes a decision in the matter, he/she shall state the ground for it, and the decision shall be entered into the log book or the special protocol.

4) The Crew Purser/HR Manager should, if possible, act as the Secretary to the Committee.

5) A decision on dismissal shall be made as soon as possible and, at the latest, within fourteen (14) days after the circumstances of the case became known to the Master, unless special conditions necessitate a longer time limit. The Seafarer shall, if possible, be informed of the decision immediately.

6) In the event that the above procedure has not been adhered to, the Seafarer shall be entitled to payment as stated in Article 4.b (ii).

7

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008



November 14, 2007

7) In the event that a Seafarer is dismissed because of misconduct, the Seafarer shall not be eligible for rehire.

E) For the purposes of this Agreement refusal by any Seafarer to obey an order to sail the Ship shall not amount to misconduct of the Seafarer where:

1) the Ship is certified unseaworthy /or otherwise substandard as defined in Article 4;

2) for any reason it would be unlawful for the Ship to sail;

3) the Seafarer refuses to sail into a warlike operations area.

## Article 5 -- Pay and Working Hour Rules

A) Pay and Wages, generally

1) The Seafarers covered by this Agreement are divided into four pay groups, 1: Marine Officers, 2: Deck and Engine Ratings, 3: Riding Crew, and 4: Hotel Personnel.

2) The wages of each Seafarer shall be calculated in accordance with this Agreement and the attached Wage Scales, Annex 1: (Marine Officers) and Annex 2: (Deck and Engine Ratings), Annex 3: (Riding Crew), and Annex 4: (Hotel Personnel).

3) The Owners/Company may pay net wages by Direct Deposit. The Seafarers shall receive their wages in two payments -- one payment made on the 15th of the month and the second made on or before the last day of the month -- with the amount paid each pay period being equal to one half of the Seafarer's guaranteed monthly wages minus lawful deductions. Any extra overtime compensation earned during a pay period shall be paid no later than the payday that falls on or before the 15th of the following month.

4) The only deductions from such wages shall be proper statutory deductions required by applicable national laws or regulations, deductions recorded in this Agreement and its attachments; deductions and allotments authorised by the Seafarer and bank fees associated with net pay Direct Deposits of Seafarer pay. The Owners/Company and the Union recognize the bank

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008



November 14, 2007

fees associated with net pay Direct Deposit and bank transfers as lawful deductions for the Seafarer's pay.

5) For the purpose of calculating wages for a partial month, every month shall be regarded as having thirty (30) days and every day shall be regarded as one-thirtieth (1/30) of a month.

6) Pay accrues from and including the day of sign on and up to and including the day of sign off. For purposes of calculating wages for a partial month, all Seafarers on Sign-on and Sign-off days shall be guaranteed a minimum of eight (8) hours pay even if the actual amount of hours worked is less than the eight (8) hours. For purposes of calculating wages for a partial month, at sign-off, sick days are not counted as hours worked.

B) Work Rules, generally

1) Any break, as approved by the Seafarers supervisor, during the work period of less than fifteen (15) minutes shall be counted as working time.

2) Overtime work will be performed at the direction of the Master or the Master's representative.

3) Overtime shall be recorded on a daily basis and signed by a designated supervisor at least once per week. A copy of the signed overtime record shall be given to the Seafarer, if requested by the Seafarer. The Owners/Company might use an electronic recording system.

4) The following days shall be considered Public Holidays at sea or in port: New Years Day (January 1), Maundy Thursday (Easter), Good Friday (Easter), Easter Sunday, Labour Day (May 1), Philippine Independence Day (June 12), Christmas Eve (December 24), Christmas Day (December 25) and New Year's Eve (December 31).

5) Seafarers shall perform all necessary service to maintain the safety of the ship, its crew, passengers and cargo and the lives of others aboard other vessels, including participating in the training for the use of fire equipment, other safety equipment, the use and manning of life boats and life rafts as determined solely by the Master. Such safety duties and training shall not count as working hours and for overtime payment if performed outside the individual Seafarers normal working hours.

9



November 14, 2007

### Article 6 -- Working Hours and Pay of Marine Officers with totally Consolidated Wages:

A) The Pay is stated in Annex 1.

B) The Marine Officers with totally consolidated wages are the Master, Staff Captain, Chief Engineer, Chief Engineer Jr., and Chief Electrical Engineer. The seafarers in this group are salaried. Monthly Total Pay, stated in the Wage Scale (Annex 1) is compensation for all hours worked, including irregular working hours, work on Saturdays, Sundays and on Public Holidays.

### Article 7 -- Working Hours and Pay of Marine Officers with partially Consolidated Wages:

A) The Pay is stated in Annex 1.

B) Monthly Total Pay for Marine Officers with partially consolidated wages consists of Monthly Basic Pay, Monthly Guaranteed Overtime Pay, and extra hourly overtime.

C) The Monthly Basic Pay is for a forty-four (44) hour work week, and compensation for work between forty-four (44) and fifty-six (56) hours per week. The Monthly Basic Pay includes compensation for irregular working hours, work on Saturdays, Sundays and on Public Holidays.

D) The Monthly Guaranteed Overtime Pay is overtime compensation covering the Guaranteed Overtime Hours.

E) The Hourly Overtime Rate is for overtime hours worked each month above the number of guaranteed overtime hours.

F) Overtime work will be performed at the direction of the Master or the Master's representative. Any overtime hours in addition to the Guaranteed Overtime will be compensated at the Hourly Overtime Rate stated in the Seafarer's Wage Scale.

### Article 8 -- Working Hours and Pay of Deck and Engine Ratings and Riding Crew:

A) The Pay for Deck and Engine Ratings is stated in Annex 2. The pay for Riding Crew is stated in Annex 3.

10



November 14, 2007

B)    Monthly Total Pay consists of Monthly Guaranteed Basic Pay, Monthly Guaranteed Initial Overtime Pay, Monthly Guaranteed Supplemental Overtime Pay, and Extra Hourly Overtime.

C)    Monthly Guaranteed Basic Pay is for a forty-four (44) hour workweek. Monthly Guaranteed Basic Pay includes compensation for irregular working hours, work on Saturdays and Sundays. Monthly Guaranteed Initial Overtime Pay is for work between forty-four (44) hours and fifty-six (56) hours per week. Monthly Guaranteed Supplemental Overtime Pay is for an additional sixty-point-sixty-two (60.62) Guaranteed Overtime Hours per month. The total of monthly guaranteed pay is in return for 303.10 hours of work per month.

D)    The Extra Overtime Rate Per Hour is for work performed in addition to the sixty-point-six-two (60.62) Guaranteed Overtime Hours per month. The Extra Overtime Rate Per Hour is for work performed in additional to the 303.10 hours of work per month. The Extra Overtime Rate Per Hour is stated in the Wage Scale.

E)    Work on Public Holidays shall be covered by overtime compensation. The Monthly Supplemental Overtime Pay of sixty-point-sixty-two (60.62) hours per month may be used to cover Work on Public Holidays.

F)    Ratings are required to perform alternating service on deck and in the engine department when such duties and services are necessary to the trade and the vessel concerned. Compensation for such alternating service is included in the Monthly Guaranteed Pay.


**Article 9 -- Working Hours and Pay of Hotel Personnel:**

A)    The Pay for Hotel Personnel is stated in Annex 4.

B)    The Hotel Personnel are divided into four sub-groups – Groups A, Group B, Group C, and Group D.

C)    For Group A, the Monthly Total Guaranteed Pay is pay for all hours worked, including irregular working hours, work on Saturdays, Sundays and on Public Holidays. Seafarers in this group are salaried and not entitled to overtime pay.

D)    For Group B, the Monthly Total Guaranteed Pay consists of Monthly Guaranteed Basic Pay, Monthly Guaranteed Initial Overtime Pay, Monthly Guaranteed Supplemental Overtime Pay, and Extra Hourly Overtime.

11

LEGAL Dct

November 14, 2007

1) Monthly Guaranteed Basic Pay is for a forty (40) hour workweek. Monthly Guaranteed Basic Pay includes compensation for irregular working hours, work on Saturdays, Sundays and on Public Holidays. Monthly Guaranteed Initial Overtime Pay is for work between forty (40) hours and fifty-six (56) hours per week. Monthly Guaranteed Supplemental Overtime Pay is for an additional sixty-point-sixty-two (60.62) Guaranteed Overtime Hours per month. The total of the Monthly Guaranteed Pay is in return for 303.10 hours of work per month.

2) The Extra Overtime Rate Per Hour is for work performed in additional to the 303.10 hours of work per month. The Extra Overtime Rate Per Hour is stated in the Seafarers' Wage Scale.

E)  For Group C, Pay consists of Monthly Guaranteed Basic Pay, Monthly Guaranteed Initial Overtime Pay, Monthly Guaranteed Supplemental Overtime Pay, and Monthly Guaranteed Vacation Pay, plus Extra Hourly Overtime earned.

1) Monthly Guaranteed Basic Pay is for a forty (40) hour work workweek. Monthly Guaranteed Basic Pay includes compensation for irregular working hours, work on Saturdays, Sundays and on Public Holidays. Monthly Guaranteed Initial Overtime Pay is for work between forty (40) hours and fifty-six (56) hours per week. Monthly Guaranteed Supplemental Overtime Pay is for an additional sixty-point-sixty-two (60.62) Guaranteed Overtime Hours per month. The total of the Monthly Guaranteed Pay is in return for 303.10 hours of work per month.

2) The Extra Overtime Rate Per Hour is for work performed in addition to the 303.10 hours of work per month. The Extra Overtime Rate Per Hour is stated in the Seafarers' Wage Scale.

3) The Monthly Total Guaranteed Pay received by Seafarers in this Group shall be made up of Gratuities or Service Charges provided by passengers. The Owners/Company shall be obligated to charge passengers a Service Charge or advise the passengers that Gratuities are suggested for Cabin Service, Dining Room Service, and Bar Service. Seafarers who receive gratuities from passengers should share a portion of the gratuities with the Seafarers who assist them. The Owners/Company may provide gratuity-sharing guidelines and assistance to the process of gratuity sharing.

4) The Monthly Total Guaranteed Pay for this Group C is USD993.00.

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008



November 14, 2007

    5)    If, in any month, the total income earned by a Seafarer in this Group is below the Seafarer's Monthly Total Guaranteed Pay, upon notification and accounting, the Seafarer shall be paid a supplement by the Owners/Company equal to the difference between the Monthly Total Guaranteed Pay amount and the total amount of the Service Charges and Gratuities received by the Seafarer from the passengers.

F)    For Group D, the Monthly Total Guaranteed Pay consists of Monthly Guaranteed Basic Pay, Monthly Guaranteed Initial Overtime Pay, Monthly Guaranteed Supplemental Overtime Pay, and Extra Hourly Overtime.

    1)    Monthly Guaranteed Basic Pay is for a forty (40) hour workweek. Monthly Guaranteed Basic Pay includes compensation for irregular working hours, work on Saturdays, Sundays and on Public Holidays. Monthly Guaranteed Initial Overtime Pay is for work between forty (40) hours and fifty-six (56) hours per week. Monthly Guaranteed Supplemental Overtime Pay is for an additional sixty-point-sixty-two (60.62) Guaranteed Overtime Hours per month. The total of the Monthly Guaranteed Pay is in return for 303.10 hours of work per month.

    2)    The Extra Overtime Rate Per Hour is for work performed in addition to the 303.10 hours of work per month. The Extra Overtime Rate is stated in the Seafarer's Wage Scale.

## Article 10 -- Onboard Luggage Delivery

The Owners/Company may pay Seafarers a flat fee (instead of the Extra Overtime Rate Per Hour) for the time and effort required to deliver passenger luggage.

## Article 11 -- Social Program Compensation

For Marine Deck and Engine Ratings and Riding Crew, the Social Program Compensation included in the Wage Scale (Annex 2 and 3), shall be paid directly to the Seafarer. It is the understanding between the parties to this Agreement that the Social Program Compensation is meant to be used by the Seafarer to purchase medical insurance covering the Seafarer when on vacation, medical insurance for the Seafarers family and to enable the Seafarer to participate in a pension fund scheme in the Seafarers country of residence.

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008

November 14, 2007

## Article 12 -- Retirement Plan

The Owners/Company has a Shipboard Retirement Plan available for shipboard employees. The plan is not available to Seafarers for whom the Owners/Company contributes to other retirement programs on behalf of the Seafarer. The rights and benefits of Seafarers and beneficiaries are determined by the terms and conditions of the formal Plan. The Owners/Company reserves the right to amend and/or terminate the plan without notice at any time. The Owners/Company agrees to inform its Seafarers and the Union of any such changes and/or termination. The complete Plan is available for all Seafarers to review at the Crew Relation Purser's desk.

## Article 13 -- Allotments

The Owners/Company and the Union recognise that the Owners/Company must adhere to the Philippine Overseas Employment Agency (POEA) rules and Regulations regarding allotments for Filipino Seafarers. The Owners/Company and the Union recognise the POEA Allotments as lawful deductions.

## Article 14 -- Bank Transfers

The Owners/Company may give assistance to Seafarers wishing to transfer money to their families and/or bank accounts. The Owners/Company may give this assistance by paying net wages by Direct Deposit. The Owners/Company and the Union recognize the bank fees associated with net pay Direct Deposits and bank transfers as lawful deductions from the Seafarer's pay.

## Article 15 -- Repatriation

A)   Repatriation shall take place in such manner that it meets all reasonable requirements. The Owners/Company shall be liable for the cost of maintaining the Seafarer ashore until repatriation takes place. A Seafarer shall be entitled to repatriation at the Owners/Company's expense to the gateway city:

1)   upon the loss, laying-up or sale of the Ship;

2)   if the Ship has been arrested and provided the Ship has remained under arrest for more than fourteen (14) days;

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008

November 14, 2007

 3)   at the end of the Service Period except because of the Seafarer's misconduct.

B)   The Owners/Company's obligation to repatriate ceases:

 1)   if the Seafarer has been lawfully dismissed, ref Article 4;

 2)   if the Seafarer terminates the Employment Agreement during the Probationary Period, ref Article 4;

 3)   if the Seafarer terminates the Employment Agreement before the expiration of the service period, ref Article 4.

C)   Extra costs relating to any change of address during the Service Period shall be the responsibility of the Seafarer.   If the move results in any savings in repatriation costs, the Owners/Company shall realize the savings.

D)   To preserve the Owners/Company's rights (in accordance with some police/immigration rules and regulations of various countries), each Seafarer shall deposit money with the Owners/Company that will be used to purchase the Seafarer's transportation to his/her gateway city in the event the Seafarer is discharged at his/her own request or for cause prior to the end of the Service Period.  The amount of the deposit will depend upon the geographic location of the Seafarer's gateway city, and will be specified in notices to be posted from time to time by the Owners/Company.   Seafarers on their first contract must deposit the full amount at the time they first report for duty.  Returning Seafarers must deposit the full amount at the time they report for duty in connection with their current contract, or may make the deposit in installments, provided that the full amount is deposited no later than ninety (90) days after the date on which the Seafarer reported for duty in connection with the current contract.  The deposit will be returned to the Seafarer at the end of the Service Period.  Alternatively, the Seafarer may request that the Owners/Company use the deposit to purchase the transportation that the Seafarer will use to meet the vessel at the commencement of the Seafarer's Service Period, with any amount remaining after such a purchase being returned to the Seafarer.

### Article 16 -- Compassionate Leave

The Owners/Company may consider a special request of early termination of the Employment Agreement on compassionate grounds, if such termination is requested in the case of death or serious illness of spouse, children or parents.

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008



November 14, 2007

## Article 17 -- Fair Treatment Polices

A)   The Owners/Company has a Shipboard Employee Counseling and Warning Policy (an extract is attached as Annex 7) and a Statement of Fair Treatment for Shipboard Employees.   The Policy and the Statement are covered by the Grievance and Dispute Resolution Procedure available to Seafarers who feel they have not been treated fairly in accordance with this Agreement and the Owners/Company's policies.   The complete process is described in the Owners/Company's Safety and Quality Management System (SQM) and is available for all Seafarers to review at the Crew Relation Purser's desk.

B)   Discrimination against or harassment of anyone by Seafarers on the basis of race, sex, nationality, religion, age, sexual orientation, color, disability, or ethnic origin will not be tolerated and may constitute cause for termination of employment.

C)   In this agreement, words in the masculine gender shall include the feminine.

D)   Seafarers covered by this Agreement may at any time contact the Union and ask for help in all employment related matters.

## Article 18 -- Fire Squads and Mobile Groups

Seafarers participating in Fire Squads/Mobile Groups, which requires them to remain onboard when the ship is in port, should as far as practicably possible be rotated so that all Seafarers participating shall not be disproportionately burdened.

## Article 19 -- Manning

The Ship shall be competently and adequately manned so as to ensure its safe operation.

## Article 20 -- Rest Period

A)   Each Seafarer shall have minimum of ten (10) hours off duty in any twenty-four (24) hours and seventy-seven (77) hours in any seven (7) day period. Hours of rest may be divided into no more than two (2) periods, one (1) of which shall be at least six (6) consecutive hours off duty, and the interval between consecutive periods of rest shall not exceed fourteen (14).

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008



November 14, 2007

B)   The Owners/Company will make its best effort to conduct Musters, fire fighting and lifeboat drills, and drills prescribed by national laws and regulations and by international instruments in a manner that minimizes the disturbance of rest periods and does not induce fatigue.

## Article 21 -- Teaching and Training

The Owners/Company agrees to undertake a teaching and training program so that a continuous and systematic training is conducted on board, enabling promotion to higher paid positions. The starting pay for such trainee jobs shall be at least as stipulated for the Catering Trainee position for the first ten (10) month contract. Upon re-contracting, the monthly pay level shall be increased to that of the Utility position or the pay level of any other position for which the Seafarer may be rehired.

## Article 22 -- Transfer of Seafarers

The Owners/Company shall have the option at their discretion of transferring Seafarers from one ship to another ship, provided, however, that there will not be any interruption of time for calculation of leave benefits nor increase in length of service.

## Article 23 -- Cargo Handling

A)   Seafarers shall not be required or induced to carry out cargo handling duties on the port docks and other dock work traditionally or historically done by dock workers without the prior agreement of the ITF dockers' union concerned, unless ITF dockers' union workers are not available and the Owners/Company's guests cannot otherwise be accommodated and provided that the individual Seafarers volunteer to carry out such duties, for which they shall be adequately compensated.

B)   Compensation for such work performed during the normal working week, as specified in Article 5, shall be by the payment of double the overtime rate for each hour or part of an hour that such work is performed, in addition to the Basic Wages. Any such work performed outside the normal working week will be compensated at triple the overtime rate for each hour or part of an hour that such work is performed in addition to the payment of the normal hourly overtime rate.

17



November 14, 2007

## Article 24 -- Medical Attention

A)      General Rules:

    1)      A Seafarer, who is discharged owing to sickness or injury, shall be entitled to reasonable and necessary medical treatment (including hospitalisation) at the Owners/Company's expense until the sick or injured Seafarer reaches maximum medical improvement.   Maximum medical improvement shall occur when the sickness or injury is declared to be permanent, chronic, or incurable in character.

    2)      If the Seafarer is covered by a national insurance scheme, expenses shall first be reimbursed by the national insurance scheme first and then by the Owners/Company, provided that this provision does not modify the Owners/Company obligation set forth in the paragraph above.   This also applies in cases where the Seafarer has had the opportunity to become a member of a national insurance scheme at the time when the Seafarer entered into the Employment Agreement or later on.   If the Seafarer elects to be treated by a provider not in the Company network, national health insurance scheme, or other Government-sponsored health plan, the Owners/Company's sole obligation in that case is to pay the lesser of the Owners/Company network rate, the national health insurance scheme rate, or other Government rate.

B)      Insurance Plan:

The Owners/Company has a medical insurance plan available for certain eligible positions as defined by the Owners/Company.   Information regarding this plan can be obtained from the Crew Purser/HR Office.

## Article 25 -- Sickness, Injury and Sick Pay

A)      During the Service Period and at the time of disembarking, the Seafarer shall be subject to medical examination when requested by the Owners/Company or its representative at the Owners/Company's expense.

    1)      While serving on board or during travel to and from the vessel by the most direct route, or as directed by the Owners/Company, a sick or injured Seafarer shall be entitled to treatment at the Owners/Company's expense until the Seafarer reaches Maximum Medical Improvement.

18

LEGAL

November 14, 2007

    2)   If the Seafarer is covered by a national insurance scheme, expenses shall be reimbursed by the national insurance scheme first, then by the Owners/Company, provided that this does not modify the Owners/Company's obligation to provide treatment until the Seafarer reaches Maximum Medical Improvement.

B)   Should a Seafarer become sick or injured during a voyage within the Service Period, the Owners/Company will pay the Seafarer Sick Pay at the per diem rate of the Monthly Basic Pay from such time during a voyage as the Seafarer is unable to work until such time as the Seafarer is Fit For Duty or up to a maximum of one-hundred-and-thirty (130) days, provided that satisfactory medical certificates are submitted to the Owners/Company. The days that the Seafarer is not Fit For Duty are sick days. Sick days are not counted as time worked.

C)   In the event of sickness or injury necessitating signing off for Maintenance and Cure, subject to medical approval, all payments shall be subject to the seafarer's compliance with the instructions of the Owners/Company and its Agents at the port where the seafarer is landed for medical care.

    1)   With respect to Maintenance, the Owners/Company shall provide the seafarer with living accommodations during the period of treatment and convalescence, or in the discretion of the Owners/Company, provide USD twelve ($12) to twenty five ($25) per day, to defray living expenses until the sick or injured seafarer has been cured or until the sickness or incapacity has been declared to have reached Maximum Medical Improvement.

    2)   With respect to Cure, the Owners/Company shall be liable to defray the expenses of medical care and treatments until the sick or injured seafarer has been cured or until the sickness or incapacity has been declared to have reached Maximum Medical Improvement.

D)   In the event of sickness or injury necessitating signing off, the Seafarer shall be entitled to repatriation, at the Owners/Company's expense, to the Seafarer's legal residence. The seafarer shall report his/her arrival at his/her own home or original place of engagement whichever is appropriate to the Owners/Company or its Agents as soon as possible after repatriation.

E)   In the event of sickness or injury necessitating signing off, the Employment Agreement will be regarded as terminated as of the date the Seafarer signs off. However, if it is determined that the Seafarer is Fit For Duty, the Owners/Company may return the Seafarer to service without loss of service time.

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008



November 14, 2007

F) If a Seafarer's sickness or injury which necessitated signing off results in permanent disability or death, then the provisions of Article 28 and Article 29 shall apply.

**Article 26 -- Paid Leave**

A) Paid Leave (Vacation Pay) is earned on board during the Seafarer's Service Period. The terms "Vacation Pay" and "Paid Leave," and the receipt of Vacation Pay do not indicate permanent or continuous employment, nor do they constitute an indication that the Owners/Company will provide a future offer of employment. Except as indicated below, monthly Vacation Pay is calculated as being equal to the Basic Wage divided by 25 multiplied by 3 days accrued per month of on-board service. Vacation Pay is paid during the Service Period or paid at the end of the Service Period, as follows:

B) Marine Officers:

   1) Vacation is accrued with one (1) day vacation for each day worked for Seafarers on the 1:1 sailing system and a half (½) day vacation for each day worked for Seafarers on the 2:1 sailing system. Monthly Vacation Pay is calculated as being equal to the Basic Wage divided by 30 multiplied by the number of days worked on board (for Officers on the 1:1 sailing system) or equal to the Basic Wage divided by 30 multiplied by half of the number of days worked on board (for Officers on the 2:1 sailing system). Accrued vacation days are to be paid out, as earned, through the regular payroll process. Vacation days are not accrued while travelling to and from the ships for the purpose of signing on and off for vacation.

   2) In exceptional circumstances, the Owners/Company may require a Seafarer to return to work earlier than scheduled or to extend a Seafarer's service prior to his/her vacation leave. This practice will be used when other reasonable alternatives are not available. The circumstances include: illness of Key Personnel on board and any matter that could affect the safe operation of the Ship or its ability to operate.

   3) Necessary overlap in accordance with the Owners/Company SQM-policy will be during a Seafarer's vacation leave. When a Seafarer is on board for overlap as required by the Owners/Company, the Seafarer will be paid wages and accrued vacation as if he/she was on board in his regular position.

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008

November 14, 2007

4)   Seafarers are required to participate in Owners/Company Required Training for no more than fourteen (14) days annually during vacation leave in addition to any training required by the Owners/Company while on shipboard duty.  Regular salary will be paid for the days the Seafarer is participating in such training, but vacation days will not be accrued.  Travel expenses and course fees will be paid by the Owners/Company.  These terms will also apply if the Owners/Company requests the Seafarer to participate in meeting at the corporate offices or perform other duties while on vacation leave.

C)   Deck and Engine Ratings; and Riding Crew:

Vacation pay is earned based on with seven (7) days per month for every month of service. Vacation Pay is based on the Monthly Basic Pay and is in addition to the Monthly Total Pay.  Monthly Vacation Pay is calculated as being equal to the Basic Wage divided by 25 multiplied by 7 days accrued per month of on-board service.  Vacation Pay shall be paid at the end of the Service Period.  Parts of a month shall be prorated, with one-thirtieth (1/30) being equal to one day.

D)   Hotel Personnel:

1)   General: Vacation pay is earned based on three (3) days per month of service.  The Vacation Pay shall be based on the Monthly Guaranteed Basic Pay.  Monthly Vacation Pay is calculated as being equal to the Basic Wage divided by 25 multiplied by 3 days accrued per month of on-board service. Parts of a month shall be prorated, with one-thirtieth (1/30) being equal to one day.

2)   Groups A, B, and D: Vacation Pay is in addition to the Monthly Total Guaranteed Pay.  The Vacation Pay shall be paid at the end of the Service Period.

3)   Group C:  Vacation Pay is included in the Monthly Total Guaranteed Pay.

## Article 27 -- Maternity

A)   The limited nature of shipboard medical facilities makes it impossible to properly address prenatal care or any potential complications or emergencies that may arise during a pregnancy while at sea.  Consequently, pregnant Seafarers may not remain employed on board the vessel during the final three months of pregnancy under any circumstances.  Pregnant seafarers who are interested in continuing to

21

LEGAL
D CT

November 14, 2007

be employed in their positions in spite of the health risks, may do so only during the first six months of their pregnancy and only under the following circumstances:

1)   The pregnant seafarer must pay for the cost of childbirth and for any and all associated pregnancy related services and expenses required during the pregnancy;

2)   The pregnant seafarer must obtain the consultation of a licensed Shoreside Obstetrician / Gynecologist (OB/GYN) at one of the ship's ports of call, at the earliest possible opportunity;

3)   The pregnant seafarer must notify the ship's physician as soon as the seafarer becomes aware that she is pregnant and must obtain from the ship's physician the forms to be completed by the seafarer and her Shoreside OB/GYN

4)   After taking into consideration the seafarer's medical history, shipboard life, job description, and any special circumstances, the seafarer's Shoreside OB/GYN must agree to continue to treat the seafarer and must grant the seafarer medical permission to sail for a specific period of time.

5)   The pregnant seafarer must continue to be able to perform the essential functions of her job without endangering her health and safety.

B)   If, at anytime, the seafarer fails to fulfill any of the circumstances in items a) 1-5, above, then the seafarer must sign off the vessel.  Upon sign-off, the Owners/Company will provide the pregnant seafarer with an air ticket home and thirty days (30/30) minimum monthly guaranteed pay.  If the seafarer is medically determined to be Fit For Duty at the conclusion of the pregnancy but no later than twelve (12) months after sign-off, then the Owners/Company will rehire the seafarer.

### Article 28 -- Loss of Life in Service

A)   If a Seafarer dies whilst in the employment of the Owners/Company, including death occurring whilst travelling to and from the ship, or as a result of marine or other similar peril, the Owners/Company shall pay to the Seafarer's beneficiaries a compensation of USD sixty-five-thousand ($65,000).  In addition, the Owners/Company shall pay to each child under the age of twenty-one (21) USD fifteen-thousand ($15,000), with a maximum payment for four (4) children.  The names and addresses of beneficiaries shall be declared at the time of the signing

22

November 14, 2007

of the Employment Agreement.  If the Seafarer does not leave a spouse, the aforementioned sum shall be paid to the Estate of the deceased Seafarer to be administrated by the person or body authorized by law to act on the behalf of the deceased Seafarer's Estate.

B)  If a Seafarer dies whilst in the employment of the Owners/Company, including death occurring whilst travelling to and from the ship, or as a result of marine or other similar peril or while the Seafarer is entitled to medical treatment at the Owners/Company expense, the Owners/Company or its representative, the Master, shall notify next of kin and make arrangements for burial and repatriation of the coffin.  If the next of kin consent or the local authorities require, the Master may order cremation in lieu of burial and arrange for the ashes to be sent home. The expenses of burial or cremation and the entombment of the ashes, in the event this is carried out by the Owners/Company or the repatriation of the coffin or cinerary urn, shall be paid by the Owners/Company.

C)  The above-mentioned benefits do not apply if the death was caused by suicide.

D)  Any payment affected under this clause shall be without prejudice to any claim for compensation made in law, but all (100%) of such disability payments made under this agreement shall be deducted from any award, settlement or recovery for damages received by the seafarer in connection with any claim or lawsuit arising out of the injuries or incident giving rise or in any way related to the disability payments.

E)  The insurance benefits under this Article include amounts payable to Filipino nationals under POEA Rules and Regulations.

**Article 29 -- Disability**

A)  If a Seafarer suffers a disabling permanent injury as a result of an accident from any cause whatsoever whilst in the employment of the Owners/Company, regardless of the fault, including accidents occurring whilst travelling to or from the Ship and whose ability to work is reduced as a result thereof, shall in addition to his Sick Pay, be entitled to a disability compensation at a percentage depending on the degree of disability of up to USD ninety-thousand ($90,000) for Marine Officers and Hotel Group A personnel and up to USD eighty-thousand ($80,000) for all others.

B)  The compensation which the Owners/Company, Manager, Manning Agent and any other legal entity substantially connected with the vessel shall be jointly and severally liable to pay shall be calculated by reference to an agreed medical

23

November 14, 2007

report, with the Owners/Company and the Seafarer both able to commission their own. When there is disagreement a third doctor shall be appointed jointly, whose findings shall be binding on all parties.

C)    Any payment affected under any section of this Article shall be without prejudice to any claim for compensation made in law, but all (100%) of such disability payments made under this agreement shall be deducted from any award, settlement or recovery for damages received by the seafarer in connection with any claim or lawsuit arising out of the injuries or incident giving rise or in any way related to the disability payments.

D)    The insurance benefits under this Article include amounts payable to Filipino nationals under POEA Rules and Regulations.

## Article 30 -- Crew's Effects

A)    In the event of accident, fire or other mishap affecting the ship and whereby the Seafarer's personal effects are damaged or lost, Owners/Company shall pay up to USD three-thousand ($3,000). The Seafarer shall submit a signed statement specifying the items lost or damaged.

B)    The Owners/Company shall in addition pay the Seafarer for necessary clothing needed after a shipwreck.

## Article 31 -- Seafarer Food, Accommodation, and Amenities

A)    The Owners/Company shall provide sufficient food of good quality, accommodation of adequate size and standard, bedding amenities, etc., for the use of each Seafarer whilst serving on board.

B)    The accommodation standards and recreational facilities shall at least meet those criteria contained in relevant ILO instruments, with the exception of the current dispensation given by the flag state and related to the placement of cabins.

C)    The Owners/Company shall provide the necessary personal protective equipment for the use of each Seafarer whilst serving on board.   In addition, the Owners/Company will supply Seafarers with appropriate personal protective equipment for the performance a hazardous job duty.  Seafarers should be advised of possible hazards of any work to be carried out and instructed of any necessary precautions to be taken as well as of the use of the protective equipment.  If the necessary safety equipment is not available to operate in compliance with any of

24



November 14, 2007

the above regulations, Seafarers should not be permitted or requested to perform the work. Seafarers should use and take care of all protective equipment at their disposal and not misuse any means provided for their own protection or the protection of others. Personal protective equipment remains the property of the Owners/Company.

D) The Owners/Company shall provide uniforms with Owners/Company logos and laundering of same free of charge to the Seafarers covered by this Agreement.

E) The Union and the Owners/Company agree that the Owners/Company may provide crew gaming activities for the enjoyment of the seafarers. The Union and the Owners/Company agree that the Owners/Company may use some of the proceeds from the crew gaming activities to finance a Crew Welfare Fund for each ship covered by this agreement to use for seafarer recreational and/or cultural activities.

## Article 32 -- Service in Warlike Operations Areas

A) During the assignment a Seafarer shall be given full information of the war zone's inclusion in the Ship's trading pattern and shall have the right not to proceed to a warlike operations area, in which event he shall be repatriated at Owners/Company's cost with benefits accrued until the date of return to the port of engagement.

B) Where a Ship enters into an area where warlike operations take place, the Seafarer shall be paid a bonus amounting to double the Basic Wage for the duration of the Ship's stay in such area subject to a minimum of five (5) days' pay. Similarly the compensation for disability and death shall be doubled.

C) A warlike operations area will be as indicated by Lloyd's.

D) A Seafarer shall have the right to accept or decline the assignment without risking the termination of the Employment Contract or suffering any other detrimental effects

## Article 33 -- Insurance Cover

The Owners/Company shall conclude appropriate insurance to cover themselves against the possible contingencies arising from Articles 16, 19 and 20 of this Agreement.

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008

LEGAL Ð Cт

November 14, 2007

## Article 34 – Union Fees, Welfare Fund and Representation of Seafarers

A)   Subject to national legislation, all Seafarers shall have the right to join an appropriate national trade union affiliated to the ITF.

B)   The Owners/Company shall on their own behalf pay contributions to the ITF Seafarers' International Assistance, Welfare and Protection Fund in accordance with the terms of the ITF Special Agreement, if applicable.  Payment shall be remitted to the ITF through SpareBank1, P.O. Box 778 – Sentrum, N-0106 Oslo, Norway, IBAN: NO09 9001 68 533 853.  Swift Address: LABANOKK. Account No. 9001.68.18533 upon receipt of invoice.

C)   The Owners/Company shall pay a fee to the Union on behalf of the Seafarers covered by this Agreement.  The amount shall be stated in a Protocol between the Owners/Company and the Union.  The Owners/Company shall, at least once every three (3) months, transfer the Fees to the Union.  The Union Fees may be deducted from each individual Seafarer.  The Union Fees are part of the TCC Benchmark Calculations.  The Union Fees should be remitted to the Union through SpareBank1, P.O. Box 778 – Sentrum, N-0106 Oslo, Norway.  IBAN: NO09 9001 0487 853.  Swift Address: LABANOKK.  Account Number 9001.04.87853.

C)   The Owners/Company acknowledges the right of Seafarers to be members of the union and to be protected against acts of anti-union discrimination as per ILO Conventions Nos. 87 and 98.

D)   The Owners/Company acknowledges the right of the Union to appoint a liaison representative from among the Seafarers who shall not be dismissed nor be subject to any disciplinary proceedings unless the Union has been given advance notice and sufficient time to ensure that adequate shore based representation is provided.

E)   The parties to this Agreement agree on the principle that all disputes between the Owners/Company and the Union can be and should be resolved through friendly negotiations and have therefore agreed on a Grievance Procedure.

F)   The Owners/Company shall facilitate the establishment of an on board Safety Committee in accordance with the provisions contained in the ILO Code of Practice on Accident Prevention on Board Ships at Seas and in Port, and as part of their Safety Management System pursuant to the requirements of the ISM Code.

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008

DCT LEGAL

November 14, 2007

### Article 35 -- Statement of Fair Treatment, Grievance and Dispute Resolution Procedure

A)  The Owners/Company recognize that Seafarers have the basic right to be respected and treated in a fair and just manner at all times by superiors and fellow Seafarers. Onboard the ship, all Seafarers must function as a team in order to deliver excellent service through their efforts. By accepting this fact, it is important that we communicate with one another to solve misunderstandings or correct mistakes when they occur. Examples might be that you have a concern with a co-worker, or that you have not been paid correctly. The Owners/Company and the Union understand that the effort to solve concerns sometimes becomes more challenging because of the diversity of values and beliefs onboard, but we encourage you to embrace our policy of fair treatment and our system of complaint resolution on the ships. This system is outlined in several simple steps.

1)  Step 1: If you have a suggestion, problem or complaint, sit down with your supervisor and discuss the situation calmly. Organize your thoughts and listen carefully to the supervisor. This is the first opportunity to work together as a team.

2)  Step 2: If you are unable to solve the suggestion, problem or complaint with the supervisor, make an appointment with your Division Head. He or she will listen to you. Remember to be open and honest and to stay with the facts. Changing your story will not help the situation. Good communication and an open mind by everyone should enable the situation to be resolved.

3)  Step 3: If you have reached this step, then obviously the situation needs assistance by someone who has proven problem-solving skills. This person is your Department Head. (Staff Captain - Deck); (Chief Engineer - Engine); (Hotel Director Hotel Operations); this person has the shipboard experience and knowledge to handle human relations concerns. Make an appointment with your Department Head to discuss your concerns. He or she will listen and render a decision based on all the facts. If you are not satisfied with the decision, you may appeal the decision to the Master of the ship. The meetings will be documented, and the decision will be explained to you. All documented discussions and subsequent decision will be sent to the Director of Human Resources Marine or Hotel Operations, as applicable.

4)  Step 4: If the employee does not agree with the decision, upon request of

27

LEGAL
D (r

November 14, 2007

the employee, Human Resources will review the decision with the applicable shoreside operations department, and take further action as appropriate.

5) The above procedures are designed to give every employee on the ship several opportunities to work out suggestions, problems or complaints. We feel that in order for the system to work, all crew members and managers must know, understand and follow the outlined procedures. The company must have, and express, interest in its employees so that we are able to give our guests the best service and our employees the best working environment. There is to be no recrimination against employees who follow the procedures because they present problems or concerns.

B) Also, while on board a vessel, if the Seafarer feels that a provision of this Agreement has been violated or that he or she has been unfairly treated, the Seafarer shall have the right, either personally or through a fellow Seafarer spokesperson, to present the grievance or dispute his or her Department Head or to the ship's Human Resources Manager and if the Seafarer remains dissatisfied, to the Master. The Seafarer shall deliver to the Master written Notice of the dispute or grievance details; and no grievance or dispute will be recognized if the written Notice is not provided within thirty (30) days from the date that the grievance or dispute arose. The Master shall decide the issue. If the Seafarer is dissatisfied with the decision of the Master, then within ninety (90) days, the Seafarer shall deliver written notice of the grievance's details and of his or her dissatisfaction with the Master's decision to the representatives of the Union in Oslo, Norway and to the Owners/Company at Miami, Florida.

C) If the Seafarer is not on board the vessel and in dispute or dissatisfied with an Owners/Company decision, then within ninety (90) days of sign-off, the Seafarer may appeal, in writing, to Human Resources – Fleet Employee Relations, then within ninety (90) days of the Owners/Company's decision on appeal, the Seafarer shall deliver written notice of the grievance's details and of his or her dissatisfaction with the Owners/Company decision to the representatives of the Union in Oslo, Norway and to the Owners/Company at Miami, Florida.

D) Within thirty (30) days of receipt of the written notice of the Seafarer's dissatisfaction, the representatives of the Union and the Owners/Company shall confer to resolve the dispute.

E) If the dispute is one involving the amount of wages paid to the Seafarer, the parties hereby agree that the Owners/Company shall have the right, without incurring any further liability, within sixty (60) days of the Master receiving the written Notice from the Seafarer of a grievance, to either pay the amount claimed

28

November 14, 2007

by the Seafarer or to commence an arbitration to resolve the claim and deposit the amount claimed into an interest bearing account pending a legal determination of whether the claim has merit.   In the event the Owners/Company deposits the claimed amount as provided, the parties agree the sole amount to be paid to the Seafarer if the Seafarer's claim is later determined to have merit will be the amount claimed plus any accrued interest from when the dispute or grievance arose.

F)   The decision of the Master or the Owners/Company shall govern until the grievance or dispute can be resolved by representatives of the Union and the Owners/Company.   The Seafarer shall continue to peacefully and satisfactorily perform his or her duties and the parties shall faithfully observe this Agreement while grievances and disputes are being resolved.

## Article 36 -- Arbitration Procedure

A)   If not resolved by the Union, the Owners/Company, and/ or the Seafarer, all grievances and any other dispute whatsoever, whether in contract, regulatory, tort or otherwise, including constitutional, statutory, common law, admiralty, intentional tort and equitable claims, relating to or in any way connected with the seafarer's service for the Owners/Company, including but not limited to claims for personal injury or death, no matter how described, pleaded or styled, and whether asserted against the Owners/Company, Master, Employer, Ship Owner, vessel or vessel operator, shall be referred to and resolved exclusively by binding arbitration pursuant to the United Nations Conventions on Recognition and Enforcement of Foreign Arbitral Awards (New York 1958), 21 U.S.T. 2517, 330 U.N.T.S. ("The Convention"), except as otherwise provided in any government mandated contract, such as the Standard POEA Contract for Philippine Seafarers. All disputes must be presented within three years from the date of the occurrence giving rise to the dispute or it will not be recognized and will be time-barred.

B)   Any arbitration shall take place in the Seafarer's country of citizenship or the ship's flag state, in the parties' discretion, unless arbitration is unavailable under the Convention in those countries, in which case only said arbitration shall take place in Miami, Florida.   The language of any arbitral proceedings shall be English.   Any arbitration shall be administered by the American Arbitration Association under its International Dispute Resolution Procedures.

C)   The Union shall appoint one arbitrator, the Owners/Company shall appoint one arbitrator and a third arbitrator shall to be jointly appointed by the Union and the Owners/Company.   However, the Owners/Company and the Union, in their discretion, may jointly select a single arbitrator.   The parties shall have the right in

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008



November 14, 2007

any arbitration to conduct limited examinations under oath of parties and witnesses, and medical examination necessary to verify any injuries or damages claimed. The Owners/Company, the Unions, and the Seafarer also acknowledge that they voluntarily and knowingly waive any right they have to a jury trial. The arbitration referred to in this Article is exclusive and mandatory. Claims and lawsuits may not be brought by any Seafarer or party hereto, except to enforce arbitration or a decision of the arbitrator.

D)   The Owners/Company shall bear the costs related to the arbitration process from beginning to end including, but not limited to, fees charged and expenses incurred by arbitrators, and any costs related to proceedings brought by the Union necessary to enforce a decision. The Union and the Owners/Company shall bear the costs of their own attorney fees and legal representation. If the Seafarer retains counsel and files suit in contravention of this Article, or rejects the representation appointed by the Union at arbitration or thereafter, then he or she will cover the cost of his or her legal representation, if any. If the Seafarer is not represented by the Union, then the arbitrator shall seek the Union's opinion as to the interpretation of this agreement before making a decision.

## Article 37 -- Construction

The interpretation of this agreement shall be made by the consensus of the Unions and the Owners/Company. If there is a disagreement between the Union and the Owners/Company as to interpretation, then the disagreement shall be resolved only through the arbitration procedure established in Article 26. Failing that, and in all other respects, the laws of the State of Florida, United States of America shall govern the interpretation of this Agreement. Legal action against the Owners/Company with respect to this Agreement, in relation to a Seafarer's service on board the vessel or with respect to the Employment Agreements between the Owners/Company and the Seafarers may be brought, if at all, only after exhaustion of the grievance and arbitration procedure set forth in this Agreement and only to enforce the decision of the Arbitrator.

## Article 38 -- Amendments to and Duration of the Agreement

This Agreement shall be effective from January 1, 2008 through December 31, 2009, and further for one year at a time if a request for termination is not given either by the Owners/Company or the Union with three (3) months written notice. The terms and conditions of this Agreement shall be reviewed annually by the Owners/Company and Union and if at any time the Owners/Company and Union mutually agree on amendments and/or additions to this Agreement, such amendments and additions shall be agreed in writing and signed by the parties and considered incorporated in the Agreement.

30

November 14, 2007

Furthermore, the terms and conditions of this Agreement may be amended at anytime by mutual agreement between the Owners/Company and the Union, such amendments shall be agreed to in writing, signed by the parties and considered incorporated into this Agreement.

Signed the DEC - 7 2007 day of November 2007

By _____
Maria Del Busto
Vice President and
Chief Human Resources Officer
ROYAL CARIBBEAN CRUISES LTD.
RCL (UK) LTD.

Date _____

By _____
Jacqueline Smith
President
NORWEGIAN SEAFARERS' UNION

18.12.2007
Date

31

November 14, 2007

# Annex 1, 2, 3 and 4

## WAGE SCALES

The Wage Scales are attached to the original signed document and otherwise kept by the Crew Relation Purser's Desk.

A Seafarer that is given an offer of promotion to a higher position might request to see the part of the Wage Scales covering the offered position.

A Seafarer might request to see the part of the Wage Scales covering his/her position.

32

October 15, 2007

## Royal Caribbean International -  Wage Table
### Appendix XX - Marine Officers - 2008



| Position / Yearly Increment | |
|---|---|
| **Master** | |
| Monthly Basic Salary | $6,347 |
| Monthly Fixed Overtime Bonus | NA |
| **Total Monthly Compensation** | $6,347 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Guaranteed/Fixed Overtime hours/month | Unlimited |
| Hourly Overtime Rate | NA |
| Daily Sick Wage Rate | $211.57 |
| **Staff Captain** | |
| Monthly Basic Salary | $5,303 |
| Monthly Fixed Overtime Bonus | NA |
| **Total Monthly Compensation** | $5,303 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Guaranteed/Fixed Overtime hours/month | Unlimited |
| Hourly Overtime Rate | NA |
| Daily Sick Wage Rate | $176.77 |
| **Chief Engineer** | |
| Monthly Basic Salary | $6,150 |
| Monthly Fixed Overtime Bonus | NA |
| **Total Monthly Compensation** | $6,150 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Guaranteed/Fixed Overtime hours/month | Unlimited |
| Hourly Overtime Rate | NA |
| Daily Sick Wage Rate | $205.00 |
| **Chief Engineer Jr.** | |
| Monthly Basic Salary | $5,303 |
| Monthly Fixed Overtime Bonus | NA |
| **Total Monthly Compensation** | $5,303 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Guaranteed/Fixed Overtime hours/month | Unlimited |
| Hourly Overtime Rate | NA |
| Daily Sick Wage Rate | $176.77 |
| **Chief Refrigeration Engineer** | |
| Monthly Basic Salary | $4,284 |
| Monthly Fixed Overtime Bonus | NA |
| **Total Monthly Compensation** | $4,284 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Guaranteed/Fixed Overtime hours/month | Unlimited |
| Hourly Overtime Rate | NA |
| Daily Sick Wage Rate | $142.82 |
| **Chief Electrical Engineer** | |
| Monthly Basic Salary | $5,406 |
| Monthly Fixed Overtime Bonus | NA |
| **Total Monthly Compensation** | $5,406 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Guaranteed/Fixed Overtime hours/month | Unlimited |
| Hourly Overtime Rate | NA |
| Daily Sick Wage Rate | $180.20 |
| **Chief Officer Safety** | |
| Monthly Basic Salary | $4,500 |
| Monthly Fixed Overtime Bonus | NA |
| **Total Monthly Compensation** | $4,500 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Guaranteed/Fixed Overtime hours/month | Unlimited |
| Hourly Overtime Rate | NA |
| Daily Sick Wage Rate | $150.00 |

October 15, 2007

**1st Officer**

| | |
|---|---|
| Monthly Basic Salary | $4,000 |
| Monthly Fixed Overtime Bonus | NA |
| **Total Monthly Compensation** | **$4,000** |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Guaranteed/Fixed Overtime hours/month | Unlimited |
| Hourly Overtime Rate | NA |
| Daily Sick Wage Rate | $133.33 |



**1st Engineer**

| | |
|---|---|
| Monthly Basic Salary | $4,500 |
| Monthly Fixed Overtime Bonus | NA |
| **Total Monthly Compensation** | **$4,500** |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Guaranteed/Fixed Overtime hours/month | Unlimited |
| Hourly Overtime Rate | NA |
| Daily Sick Wage Rate | $150.00 |

**2nd Officer**

| | |
|---|---|
| Monthly Basic Salary | $1,837 |
| Monthly Fixed Overtime Bonus | $928.86 |
| Guaranteed/Fixed Overtime hours/month | 91 |
| Hourly Overtime Pay Rate for OT above 91 hr/month | $20.74 |
| Total Monthly Compensation | $2,766 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Daily Sick Wage Rate | $61.24 |

**Facilities Manager**

| | |
|---|---|
| Monthly Basic Salary | $2,903 |
| Monthly Fixed Overtime Bonus | $1,822.75 |
| Guaranteed/Fixed Overtime hours/month | 113 |
| Hourly Overtime Pay Rate for OT above 113 hr/month | $33.24 |
| Total Monthly Compensation | $4,726 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Daily Sick Wage Rate | $96.78 |

**Maintenance Technician Manager**

| | |
|---|---|
| Monthly Basic Salary | $2,584 |
| Monthly Fixed Overtime Bonus | $1,622.29 |
| Guaranteed/Fixed Overtime hours/month | 113 |
| Hourly Overtime Pay Rate for OT above 113 hr/month | $29.58 |
| Total Monthly Compensation | $4,206 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Daily Sick Wage Rate | $86.14 |

**Environmental Officer**

| | |
|---|---|
| Monthly Basic Salary | $2,535 |
| Monthly Fixed Overtime Bonus | $1,591.39 |
| Guaranteed/Fixed Overtime hours/month | 113 |
| Hourly Overtime Pay Rate for OT above 113 hr/month | $29.02 |
| Total Monthly Compensation | $4,126 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Daily Sick Wage Rate | $84.50 |

**2nd Engineer**

| | |
|---|---|
| Monthly Basic Salary | $2,276 |
| Monthly Fixed Overtime Bonus | $1,593.51 |
| Guaranteed/Fixed Overtime hours/month | 126 |
| Hourly Overtime Pay Rate for OT above 126 hr/month | $26.26 |
| Total Monthly Compensation | $3,870 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Daily Sick Wage Rate | $75.88 |

October 15, 2007



**3rd Engineer**

| | |
|---|---|
| Monthly Basic Salary | $1,449 |
| Monthly Fixed Overtime Bonus | $909.58 |
| Guaranteed/Fixed Overtime hours/month | 113 |
| Hourly Overtime Pay Rate for OT above 113 hr/month | $16.59 |
| Total Monthly Compensation | $2,358 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Daily Sick Wage Rate | $48.30 |

**1st Electrical Engineer / Electronics Engineer**

| | |
|---|---|
| Monthly Basic Salary | $2,584 |
| Monthly Fixed Overtime Bonus | $1,679.71 |
| Guaranteed/Fixed Overtime hours/month | 117 |
| Hourly Overtime Pay Rate for OT above 117 hr/month | $29.65 |
| Total Monthly Compensation | $4,264 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Daily Sick Wage Rate | $86.14 |

**Facilities Electrical Engineer**

| | |
|---|---|
| Monthly Basic Salary | $2,328 |
| Monthly Fixed Overtime Bonus | $1,512.97 |
| Guaranteed/Fixed Overtime hours/month | 117 |
| Hourly Overtime Pay Rate for OT above 117 hr/month | $26.71 |
| Total Monthly Compensation | $3,841 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Daily Sick Wage Rate | $77.59 |

**2nd Electrical Engineer (Old Electrical Engineer)**

| | |
|---|---|
| Monthly Basic Salary | $2,162 |
| Monthly Fixed Overtime Bonus | $1,404.98 |
| Guaranteed/Fixed Overtime hours/month | 117 |
| Hourly Overtime Pay Rate for OT above 117 hr/month | $24.80 |
| Total Monthly Compensation | $3,566 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Daily Sick Wage Rate | $72.05 |

**Security Officer**

| | |
|---|---|
| Monthly Basic Salary | $2,233 |
| Monthly Fixed Overtime Bonus | $1,674.81 |
| Guaranteed/Fixed Overtime hours/month | 135 |
| Hourly Overtime Pay Rate for OT above 135 hr/month | $25.88 |
| Total Monthly Compensation | $3,908 |
| Leave Pay Compensation/Sailing System* | 1:1 |
| Daily Sick Wage Rate | $74.44 |

**Deputy Security Officer**

| | |
|---|---|
| Monthly Basic Salary | $1,564 |
| Monthly Fixed Overtime Bonus | $790.51 |
| Guaranteed/Fixed Overtime hours/month | 91 |
| Hourly Overtime Pay Rate for OT above 91 hr/month | $17.65 |
| Total Monthly Compensation | $2,354 |
| Leave Pay Compensation/Sailing System* | 2:1 |
| Daily Sick Wage Rate | $52.12 |

**Marine Admin. Specialist (Old Shipboard Admin. Assistant)**

| | |
|---|---|
| Monthly Basic Salary | $2,081 |
| Monthly Fixed Overtime Bonus | $1,052.03 |
| Guaranteed/Fixed Overtime hours/month | 91 |
| Hourly Overtime Pay Rate for OT above 91 hr/month | $23.49 |
| Total Monthly Compensation | $3,133 |
| Leave Pay Compensation/Sailing System* | 2:1 |
| Daily Sick Wage Rate | $69.36 |

October 15, 2007



**Operations Trainer**

| | |
|---|---:|
| Monthly Basic Salary | $2,120 |
| Monthly Fixed Overtime Bonus | $1,378.22 |
| **Guaranteed/Fixed Overtime hours/month** | **117** |
| **Hourly Overtime Pay Rate for OT above 117 hr/month** | **$24.33** |
| **Total Monthly Compensation** | **$3,499** |
| **Leave Pay Compensation/Sailing System\*** | **1:1** |
| **Daily Sick Wage Rate** | **$70.68** |

**Apprentice Officer (Cadet)** 0

| | |
|---|---:|
| Monthly Basic Salary | $871 |
| Monthly Fixed Overtime Bonus | $440.34 |
| **Guaranteed/Fixed Overtime hours/month** | **91** |
| **Hourly Overtime Pay Rate for OT above 91 hr/month** | **$9.83** |
| **Total Monthly Compensation** | **$1,311** |
| **Leave Pay Compensation/Sailing System\*** | **NA** |
| **Daily Sick Wage Rate** | **$29.03** |

**Leave Pay Compensation/Sailing System\***

Officers on a 1:1 Sailing System accrue 1 (one) day vacation pay for every day worked onboard.

Officers on a 2 :1 Sailing System accrue 1/2 (half) a day vacation pay for every day worked onboard.

October 15, 2007

of 13

# Royal Caribbean International - Wage Table
## Appendix X.X - Marine Riding - 200

| 1 | Factor | 2 | 3 | 4 | 5 | 6 | 7A | 7B | 8 | 9 | Social Comp. 10 | End of Serv. Grat. 11 | IMO STCW 12 | Union Fee 13 | T&D 14 | CAM Related 15 | Total ITF 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENGINE FOREMAN | 1.320 | $759 | $259 | $302 | $1,320 | $213 | NA | $13 | $4.98 | $5.98 | $95 | $40 | $33 | $20 | $30 | $70 | $1,820 |
| TECHNICAL STOREKEEPER 1 | 1.320 | $759 | $259 | $302 | $1,320 | $213 | NA | $13 | $4.98 | $5.98 | $95 | $40 | $33 | $20 | $30 | $70 | $1,820 |
| BOATSWAIN | 1.250 | $719 | $245 | $286 | $1,250 | $201 | NA | $13 | $4.72 | $5.66 | $95 | $40 | $33 | $20 | $30 | $70 | $1,738 |
| CARPENTER SUPERVISOR | 1.250 | $719 | $245 | $286 | $1,250 | $201 | NA | $13 | $4.72 | $5.66 | $95 | $40 | $33 | $20 | $30 | $70 | $1,738 |
| REPAIRMAN SUPERVISOR | 1.250 | $719 | $245 | $286 | $1,250 | $201 | NA | $13 | $4.72 | $5.66 | $95 | $40 | $33 | $20 | $30 | $70 | $1,738 |
| CARPENTER | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $13 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| REPAIRMAN | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $13 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| ASST. ELECTRICIAN | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $13 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| ASSISTANT REF. ENGINEER | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $13 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| TECHNICAL STOREKEEPER | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $13 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| SECURITY SUPERVISOR | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $13 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| INCINERATOR TECHNICIAN 1 | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $13 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| AB | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $11 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| QUARTERMASTER | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $11 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| 1ST ASST. CARPENTER | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $11 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| UPHOLSTERER | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $11 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| MOTORMAN | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $11 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| INCINERATOR TECHNICIAN | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $11 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| 1ST ASST. REPAIRMAN | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $11 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| 1ST ASST. ELECTRICIAN | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $11 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| FLOOR MAINTANCE SUPERV. | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $11 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| ORDINARY SEAMAN | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $9 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| 2ND ASST. CARPENTER | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $9 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| 2ND UPHOLSTERER | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $9 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| OILER | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $9 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| 2ND ASST. REPAIRMAN | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $9 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| 2ND ASST. ELECTRICIAN | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $9 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| 2ND ASST. REF. ENGINEER | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $9 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| SECURITY GUARD | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $9 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| INCINERATOR OPERATOR 1 | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $9 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| FLOOR MAINTENANCE | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $9 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| 3RD ASST. CARPENTER | 0.660 | $380 | $129 | $151 | $660 | $106 | NA | $7 | $2.49 | $2.99 | $95 | $40 | $33 | $20 | $30 | $70 | $1,054 |
| 3RD ASST. UPOLSTERER | 0.660 | $380 | $129 | $151 | $660 | $106 | NA | $7 | $2.49 | $2.99 | $95 | $40 | $33 | $20 | $30 | $70 | $1,054 |

LEGAL D-7

Octᴏ__ᵣ 15, 2007

| Position | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3RD ASST. REPAIRMAN | 0.660 | $380 | $129 | $151 | $660 | $106 | NA | $7 | $2.49 | $2.99 | $95 | $40 | $33 | $20 | $30 | $70 | $1,054 |
| 3RD ASST. ELECTRICIAN | 0.660 | $380 | $129 | $151 | $660 | $106 | NA | $7 | $2.49 | $2.99 | $95 | $40 | $33 | $20 | $30 | $70 | $1,054 |
| 3RD ASST. REF. ENGINEER | 0.660 | $380 | $129 | $151 | $660 | $106 | NA | $7 | $2.49 | $2.99 | $95 | $40 | $33 | $20 | $30 | $70 | $1,054 |
| INCINERATOR OPERATOR | 0.660 | $380 | $129 | $151 | $660 | $106 | NA | $7 | $2.49 | $2.99 | $95 | $40 | $33 | $20 | $30 | $70 | $1,054 |
| JR. SEAMAN | 0.590 | $339 | $116 | $135 | $590 | $95 | NA | $6 | $2.23 | $2.67 | $95 | $40 | $33 | $20 | $30 | $70 | $972 |
| JR. ENGINE MAN | 0.590 | $339 | $116 | $135 | $590 | $95 | NA | $6 | $2.23 | $2.67 | $95 | $40 | $33 | $20 | $30 | $70 | $972 |
| DECK TRAINEE** | 0.320 | $184 | $63 | $73 | $320 | $52 | NA | $3 | $1.21 | $1.45 | $95 | $40 | $33 | $20 | $30 | $70 | $659 |
| ENGINE TRAINEE** | 0.320 | $184 | $63 | $73 | $320 | $52 | NA | $3 | $1.21 | $1.45 | $95 | $40 | $33 | $20 | $30 | $70 | $659 |

** 1ST CONTRACT ONLY
Above values are all in US Dollars

NOTES
1. POSITION
2. GUARANTEED MONTHLY BASIC PAY FOR 44 HOURS PER WEEK
3. MONTHLY INITIAL OVERTIME COMPENSATION FOR WORK BETWEEN 44 AND 56 HOURS PER WEEK
4. MONTHLY SUPPLEMENTAL OVERTIME COMPENSATION FOR 60.62 GUARANTEED OVERTIME HOURS PER MONTH
5. GUARANTEED MONTHLY TOTAL PAY
6. MONTHLY COMPENSATION FOR SEVEN DAYS VACATION PAY
7A. SENIORITY PAY AFTER FIRST AND SECOND SERVICE PERIOD
7B. RIDING CREW BONUS
8. GUARANTEED OVERTIME RATE PER HOUR, FOR 60.62 GUARANTEED OVERTIME HOURS PER MONTH
9. EXTRA OVERTIME RATE PER HOUR FOR WORK PERFORMED IN ADDITION TO THE GUARANTEED OVERTIME
10. SOCIAL PROGRAM COMPENSATION
11. RCCL END OF SERVICE GRATUITIES
12. ADDITIONAL NON COMPENSATION BENEFIT FOR IMO/STCW
13. UNION FEE
14. ADDITIONAL NON COMPENSATION BENEFIT FOR TRAINING AND DEVELOPMENT
15. ADDITIONAL NON COMPENSATION BENEFIT FOR CAM (HIRING MEDICAL, SHENGEN AND C1D VISAS, PASSPORT & BLUE BOOK RENEWAL, INTERNET ACCESS)
16. ADDITIONAL NON COMPENSATION BENEFITS + BASE PAY



Oct. 15, 2007

## Royal Caribbean International - Wage Table
### Appendix XX - Marine Ratings - 2008

| 1 | Factor | 2 | 3 | 4 | 5 | 6 | 7A | 7B | 8 | 9 | Social Comp. 10 | End of Serv. Grat. 11 | IMO STCW 12 | Union Fee 13 | T&D 14 | CAM Related 15 | Total ITF 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENGINE FOREMAN | 1.320 | $759 | $259 | $302 | $1,320 | $213 | NA | $0 | $4.98 | $5.98 | $95 | $40 | $33 | $20 | $30 | $70 | $1,820 |
| TECHNICAL STOREKEEPER 1 | 1.320 | $759 | $259 | $302 | $1,320 | $213 | NA | $0 | $4.98 | $5.98 | $95 | $40 | $33 | $20 | $30 | $70 | $1,820 |
|  | 1.320 | $759 | $259 | $302 | $1,320 | $213 | NA | $0 | $4.98 | $5.98 | $95 | $40 | $33 | $20 | $30 | $70 | $1,820 |
| BOATSWAIN | 1.250 | $719 | $245 | $286 | $1,250 | $201 | NA | $0 | $4.72 | $5.66 | $95 | $40 | $33 | $20 | $30 | $70 | $1,738 |
| FACILITIES CARPENTER SUPERVISOR | 1.250 | $719 | $245 | $286 | $1,250 | $201 | NA | $0 | $4.72 | $5.66 | $95 | $40 | $33 | $20 | $30 | $70 | $1,738 |
| FACILITIES REPAIRMAN SUPERVISOR | 1.250 | $719 | $245 | $286 | $1,250 | $201 | NA | $0 | $4.72 | $5.66 | $95 | $40 | $33 | $20 | $30 | $70 | $1,738 |
| FACILITIES CARPENTER | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $0 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| REPAIRMAN /FACILITIES REPAIRMAN | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $0 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| ASST. ELECTRICIAN / FACILITIES ASST. ELECTRICIAN | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $0 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| ASSISTANT REF. ENGINEER | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $0 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| TECHNICAL STOREKEEPER | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $0 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| SECURITY SUPERVISOR | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $0 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| INCINERATOR TECHNICIAN 1 | 1.194 | $687 | $234 | $273 | $1,194 | $192 | NA | $0 | $4.50 | $5.41 | $95 | $40 | $33 | $20 | $30 | $70 | $1,673 |
| AB | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $0 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| QUARTERMASTER | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $0 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| FACILITIES 1ST ASST. CARPENTER | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $0 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| FACILITIES UPHOLSTERER | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $0 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| MOTORMAN | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $0 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| INCINERATOR TECHNICIAN | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $0 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| 1ST ASST. REPAIRMAN / FACILITIES 1ST ASST. REPAIRMAN | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $0 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| 1ST ASST. ELECTRICIAN / FACILITIES 1ST ASST. ELECTRICIAN | 1.000 | $575 | $196 | $229 | $1,000 | $161 | NA | $0 | $3.77 | $4.53 | $95 | $40 | $33 | $20 | $30 | $70 | $1,448 |
| ORDINARY SEAMAN | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $0 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| FACILITIES 2ND ASST. CARPENTER | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $0 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| FACILITIES 2ND UPHOLSTERER | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $0 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| OILER | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $0 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| 2ND ASST. REPAIRMAN / FACILITIES 2ND ASST. REPAIRMAN | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $0 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| 2ND ASST. ELECTRICIAN / FACILITIES 2ND ASST. ELECTRICIAN | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $0 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| 2ND ASST. REF. ENGINEER | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $0 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| SECURITY GUARD | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $0 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |
| INCINERATOR OPERATOR 1 | 0.810 | $466 | $159 | $185 | $810 | $130 | NA | $0 | $3.06 | $3.67 | $95 | $40 | $33 | $20 | $30 | $70 | $1,228 |

of 13

LEGAL

| Position | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FACILITIES 3RD ASST. CARPENTER | 0.660 | $380 | $129 | $151 | $660 | $106 | NA | $0 | $2.49 | $2.99 | $45 | $40 | $33 | $20 | $30 | $70 | $1,004 |
| FACILITIES 3RD ASST. UPOLSTERER | 0.660 | $380 | $129 | $151 | $660 | $106 | NA | $0 | $2.49 | $2.99 | $45 | $40 | $33 | $20 | $30 | $70 | $1,004 |
| 3RD ASST. REPAIRMAN / FACILITIES 3RD ASST. REPAIRMAN | 0.660 | $380 | $129 | $151 | $660 | $106 | NA | $0 | $2.49 | $2.99 | $45 | $40 | $33 | $20 | $30 | $70 | $1,004 |
| 3RD ASST. ELECTRICIAN / FACILITIES 3RD ASST. ELECTRICIAN | 0.660 | $380 | $129 | $151 | $660 | $106 | NA | $0 | $2.49 | $2.99 | $45 | $40 | $33 | $20 | $30 | $70 | $1,004 |
| 3RD ASST. REF. ENGINEER | 0.660 | $380 | $129 | $151 | $660 | $106 | NA | $0 | $2.49 | $2.99 | $45 | $40 | $33 | $20 | $30 | $70 | $1,004 |
| INCINERATOR OPERATOR | 0.660 | $380 | $129 | $151 | $660 | $106 | NA | $0 | $2.49 | $2.99 | $45 | $40 | $33 | $20 | $30 | $70 | $1,004 |
| | | | | | | | | | | | | | | | | | |
| JR. SEAMAN | 0.590 | $339 | $116 | $135 | $590 | $95 | NA | $51 | $2.23 | $2.67 | $45 | $40 | $33 | $20 | $30 | $70 | $922 |
| JR. ENGINE MAN | 0.590 | $339 | $116 | $135 | $590 | $95 | NA | $52 | $2.23 | $2.67 | $45 | $40 | $33 | $20 | $30 | $70 | $922 |

** 1ST CONTRACT ONLY

Above values are all in US Dollars

NOTES

1. POSITION
2. GUARANTEED MONTHLY BASIC PAY FOR 44 HOURS PER WEEK
3. MONTHLY INITIAL OVERTIME COMPENSATION FOR WORK BETWEEN 44 AND 56 HOURS PER WEEK
4. MONTHLY SUPPLEMENTAL OVERTIME COMPENSATION FOR 60.62 GUARANTEED OVERTIME HOURS PER MONTH
5. GUARANTEED MONTHLY TOTAL PAY
6. MONTHLY COMPENSATION FOR SEVEN DAYS VACATION PAY
7A. SENIORITY PAY AFTER FIRST AND SECOND SERVICE PERIOD
7B. RIDING CREW BONUS
8. GUARANTEED OVERTIME RATE PER HOUR, FOR 60.62 GUARANTEED OVERTIME HOURS PER MONTH
9. EXTRA OVERTIME RATE PER HOUR FOR WORK PERFORMED IN ADDITION TO THE GUARANTEED OVERTIME
10. SOCIAL PROGRAM COMPENSATION
11. RCOL END OF SERVICE GRATUITIES
12. ADDITIONAL NON COMPENSATION BENEFIT FOR IMO/STCW
13. UNION FEE
14. ADDITIONAL NON COMPENSATION BENEFIT FOR TRAINING AND DEVELOPMENT
15. ADDITIONAL NON COMPENSATION BENEFIT FOR CAM (HIRING MEDICAL, SHENGEN AND C1D VISAS, PASSPORT & BLUE BOOK RENEWAL, INTERNET ACCESS)
16. ADDITIONAL NON COMPENSATION BENEFITS + BASE PAY

12-7-7 LEGAL DCT

October 15, 2007

## Royal Caribbean International - Wage Table

Appendix XX - Hotel Group A - 2008

| 1 | Factor | 5 | 6 | 7 | 8 | Pension Plan 9 | Benefit Value T&D 10 | Internet Access 11 | Total ITF 12 |
|---|---|---|---|---|---|---|---|---|---|
| CHIEF PURSER | 2.008 | $1,943 | $117 | $32.57 | N/A | $60 | $30 | $20 | $2,171 |
| GUEST RELATIONS MANAGER - 1ST PURSER | 1.593 | $1,542 | $93 | $25.84 | N/A | $60 | $30 | $20 | $1,745 |
| CREW RELATIONS MANAGER - 1ST PURSER | 1.593 | $1,542 | $93 | $25.84 | N/A | $60 | $30 | $20 | $1,745 |
| CHIEF HOUSEKEEPER / STEWARD | 2.008 | $1,943 | $117 | $32.57 | N/A | $60 | $30 | $20 | $2,171 |
| 1ST HOUSEKEEPER / STEWARD | 1.593 | $1,542 | $93 | $25.84 | N/A | $60 | $30 | $20 | $1,745 |
| BAR MANAGER SR. | 2.317 | $2,243 | $135 | $37.58 | N/A | $60 | $30 | $20 | $2,498 |
| BAR MANAGER | 1.699 | $1,644 | $99 | $27.56 | N/A | $60 | $30 | $20 | $1,854 |
| F&B MANAGER | 2.317 | $2,243 | $135 | $37.58 | N/A | $60 | $30 | $20 | $2,498 |
| ASST. F&B MANAGER | 2.260 | $2,187 | $132 | $36.66 | N/A | $60 | $30 | $20 | $2,429 |
| EXECUTIVE CHEF | 2.317 | $2,243 | $135 | $37.58 | N/A | $60 | $30 | $20 | $2,488 |
| EXECUTIVE SOUS CHEF / CHEF DE CUISINE | 2.317 | $2,243 | $135 | $37.58 | N/A | $60 | $30 | $20 | $2,498 |
| WORKING CHEF / SOUS CHEF | 1.699 | $1,644 | $99 | $27.56 | N/A | $60 | $30 | $20 | $1,854 |
| TRAVELLING SUPERVISORS (FLOATING)* | 2.317 | $2,243 | $135 | $37.58 | N/A | $60 | $30 | $20 | $2,488 |
| PROVISION MASTER | 1.859 | $1,799 | $109 | $30.15 | N/A | $60 | $30 | $20 | $2,018 |
| MAITRE'D / DINING ROOM MANAGER | 2.008 | $1,943 | $117 | $32.57 | N/A | $60 | $30 | $20 | $2,171 |
| WINDJAMMER MANAGER | 1.859 | $1,799 | $109 | $30.15 | N/A | $60 | $30 | $20 | $2,018 |

Above values are all in US Dollars
1.   POSITION TITLE
5.   TOTAL MONTHLY GUARANTEED PAY
6.   MONTHLY COMPENSATION FOR 3 DAYS VACATION PAY
7.   SICK PAY PER DAY
8.   EXTRA OVERTIME RATE PER HOUR FOR WORK PERFORMED IN ADDITION TO THE GUARANTEED OVERTIME HOURS
9.   ADDITIONAL NON COMPENSATION BENEFIT FOR PENSION PLAN
10.  ADDITIONAL NON COMPENSATION BENEFIT FOR TRAINING AND DEVELOPMENT
11.  ADDITIONAL NON COMPENSATION BENEFIT FOR INTERNET ACCESS
12.  ADDITIONAL NON COMPENSATION BENEFITS + BASE PAY



NB: EMPLOYEES NOTED ON THIS PAY SCALE ARE SALARIED AND NOT ENTITLED TO OVERTIME PAY.

* INDICATES ALL POSITIONS WHO ACT AS A TRAVELLING SUPERVISOR.
SENIOR EXECUTIVE CHEF, PASTRY / BAKER / PANTRY / COLD KITCHEN SUPERVISOR,
PUBLIC HEALTH OFFICER, BEVERAGE SUPERVISOR, HOUSEKEEPING SUPERVISOR,
TIME & ATTENDANCE SPECIALIST

Oct... 15, 2007

# Royal Caribbean International - Wage Table
## Appendix XX - Hotel Group B - 2008

| 1 | Factor | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Pension Plan 9 | T&D 10 | Internet Access 11 | Total ITF 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2ND PURSER | 1.184 | $576 | $289 | $252 | $1,118 | $69 | $19.20 | $5.00 | $60 | $30 | $20 | $1,297 |
| 3RD PURSER / ASSISTANT PURSER | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| PRINTER PURSER | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| 2ND HOUSEKEEPER / STEWARD | 1.184 | $576 | $289 | $252 | $1,118 | $69 | $19.20 | $5.00 | $60 | $30 | $20 | $1,297 |
| STOREKEEPER | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| ASSISTANT STOREKEEPER | 0.848 | $413 | $207 | $181 | $801 | $50 | $13.75 | $3.58 | $60 | $30 | $20 | $960 |
| PHONE OPERATOR / DISPATCHER | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| LINENKEEPER | 0.715 | $348 | $175 | $152 | $675 | $42 | $11.60 | $3.02 | $60 | $30 | $20 | $827 |
| LINENKEEPER / LAUNDRY MGR | 0.848 | $413 | $207 | $181 | $801 | $50 | $13.75 | $3.58 | $60 | $30 | $20 | $960 |
| HORTICULTURIST | 1.068 | $520 | $261 | $228 | $1,008 | $62 | $17.32 | $4.51 | $60 | $30 | $20 | $1,181 |
| YEOMAN | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| KITCHEN STEWARD | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| ASSISTANT FOOD MANAGER | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| ROOM SERVICE SUPERVISOR | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| CHEF DE PARTIE I | 1.184 | $576 | $289 | $252 | $1,118 | $69 | $19.20 | $5.00 | $60 | $30 | $20 | $1,297 |
| CHEF DE PARTIE II | 1.184 | $576 | $289 | $252 | $1,118 | $69 | $19.20 | $5.00 | $60 | $30 | $20 | $1,297 |
| CHEF DE PARTIE III | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| COOK TOURNANT | 1.184 | $576 | $289 | $252 | $1,118 | $69 | $19.20 | $5.00 | $60 | $30 | $20 | $1,297 |
| COOK FISH | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| COOK - VEGETABLE | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| COOK - ROAST | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| COOK - SOUP | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| HEAD BREAKFAST COOK | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| HEAD CREW COOK | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| DEMI CHEF DE PARTIE | 0.848 | $413 | $207 | $181 | $801 | $50 | $13.75 | $3.58 | $60 | $30 | $20 | $960 |
| COOK ASSISTANT | 0.848 | $413 | $207 | $181 | $801 | $50 | $13.75 | $3.58 | $60 | $30 | $20 | $960 |
| COOK TRAINEE | 0.715 | $348 | $175 | $152 | $675 | $42 | $11.60 | $3.02 | $60 | $30 | $20 | $827 |
| BUTCHER | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| BUTCHER ASSISTANT | 0.848 | $413 | $207 | $181 | $801 | $50 | $13.75 | $3.58 | $60 | $30 | $20 | $960 |
| BUTCHER TRAINEE | 0.715 | $348 | $175 | $152 | $675 | $42 | $11.60 | $3.02 | $60 | $30 | $20 | $827 |
| HEAD PASTRY | 1.184 | $576 | $289 | $252 | $1,118 | $69 | $19.20 | $5.00 | $60 | $30 | $20 | $1,297 |
| PASTRY COOK | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| PASTRYMAN ASSISTANT | 0.848 | $413 | $207 | $181 | $801 | $50 | $13.75 | $3.58 | $60 | $30 | $20 | $960 |
| PASTRY TRAINEE | 0.715 | $348 | $175 | $152 | $675 | $42 | $11.60 | $3.02 | $60 | $30 | $20 | $827 |
| HEAD BAKER | 1.184 | $576 | $289 | $252 | $1,118 | $69 | $19.20 | $5.00 | $60 | $30 | $20 | $1,297 |
| BAKER ASSISTANT | 0.848 | $413 | $207 | $181 | $801 | $50 | $13.75 | $3.58 | $60 | $30 | $20 | $960 |
| BAKER TRAINEE | 0.715 | $348 | $175 | $152 | $675 | $42 | $11.60 | $3.02 | $60 | $30 | $20 | $827 |
| HEAD PANTRY | 1.184 | $576 | $289 | $252 | $1,118 | $69 | $19.20 | $5.00 | $60 | $30 | $20 | $1,297 |
| PANTRYMAN ASSISTANT | 0.848 | $413 | $207 | $181 | $801 | $50 | $13.75 | $3.58 | $60 | $30 | $20 | $960 |

Oct. 15, 2007

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PANTRYMAN TRAINEE | 0.715 | $348 | $175 | $152 | $675 | $42 | $11.60 | $3.02 | $60 | $30 | $20 | $827 |
| HEAD BUFFET | 1,184 | $576 | $289 | $252 | $1,118 | $69 | $19.20 | $5.00 | $60 | $30 | $20 | $1,297 |
| BUFFETMAN ASSISTANT | 0.848 | $413 | $207 | $181 | $801 | $50 | $13.75 | $3.58 | $60 | $30 | $20 | $960 |
| BUFFET TRAINEE | 0.715 | $348 | $175 | $152 | $675 | $42 | $11.60 | $3.02 | $60 | $30 | $20 | $827 |

Above values are all in US Dollars

1.   POSITION TITLE
2.   MONTHLY BASIC PAY FOR 40 HOURS PER WEEK
3.   MONTHLY COMPENSATION FOR WORK BETWEEN 40 AND 56 HOURS PER WEEK
4.   MONTHLY COMPENSATION FOR 60.82 GUARANTEED OVERTIME HOURS PER MONTH
5.   TOTAL MONTHLY GUARANTEED PAY for 303.10 HOURS OF WORK PER MONTH
6.   MONTHLY COMPENSATION FOR 3 DAYS VACATION PAY
7.   SICK PAY PER DAY
8.   EXTRA OVERTIME RATE PER HOUR FOR WORK PERFORMED IN ADDITION TO THE GUARANTEED OVERTIME HOURS
9.   ADDITIONAL NON COMPENSATION BENEFIT FOR PENSION PLAN
10.  ADDITIONAL NON COMPENSATION BENEFIT FOR TRAINING AND DEVELOPMENT
11.  ADDITIONAL NON COMPENSATION BENEFIT FOR INTERNET ACCESS
12.  ADDITIONAL NON COMPENSATION BENEFITS + BASE PAY



October 15, 2007

# Royal Caribbean International - Wage Table

Appendix XX - Hotel Group C - 2008

| 1 | Factor | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Benefit Value | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | | | Pension Plan 9 | T&D 10 | Internet Access 11 | Total ITF 12 |
| STATEROOM / CABIN ATTENDANT*(*) | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| HEAD STATEROOM / CABIN ATTENDANT* | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| HEAD WINE STEWARD/ESS* | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| WINE STEWARD/ESS* | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| WINE STEWARD/ESS* | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| BAR SUPERVISOR* | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| HEAD BARTENDER* | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| BARTENDER* | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| HEAD BAR WAITER / SERVER* | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| BAR WAITER / SERVER* | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| HEAD WAITER/ESS* | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| CAPTAIN'S WAITER* | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| WAITER/ESS* | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |
| ASSISTANT WAITER/ESS* | 1.000 | $487 | $244 | $213 | $944 | $58 | $16.22 | $4.22 | $60 | $30 | $20 | $1,112 |



Above values are all in US Dollars

1.  POSITION TITLE
2.  MONTHLY BASIC PAY FOR 40 HOURS PER WEEK
3.  MONTHLY COMPENSATION FOR WORK BETWEEN 40 AND 56 HOURS PER WEEK
4.  MONTHLY COMPENSATION FOR 60.82 GUARANTEED OVERTIME HOURS PER MONTH
5.  TOTAL MONTHLY GUARANTEED PAY for 303.10 HOURS OF WORK PER MONTH
6.  MONTHLY COMPENSATION FOR 3 DAYS VACATION PAY
7.  SICK PAY PER DAY
8.  EXTRA OVERTIME RATE PER HOUR FOR WORK PERFORMED IN ADDITION TO THE GUARANTEED OVERTIME HOURS
9.  ADDITIONAL NON COMPENSATION BENEFIT FOR PENSION PLAN
10. ADDITIONAL NON COMPENSATION BENEFIT FOR TRAINING AND DEVELOPMENT
11. ADDITIONAL NON COMPENSATION BENEFIT FOR INTERNET ACCESS
12. ADDITIONAL NON COMPENSATION BENEFITS + BASE PAY

* ALL AMOUNTS IN COLUMNS 2, 3, 4, 5 AND 6 ARE INCLUSIVE OF GRATUITIES PROVIDED BY PASSENGERS
OTHER THAN 50 USD PER MONTH TO BE PAID BY EMPLOYER. EMPLOYER WILL RECOMMEND THAT PASSENGERS
PAY GRATUITIES ACCORDING TO THE FOLLOWING SCALE:

STATEROOM / CABIN ATTENDANT..........USD 3.50 PER PASSENGER PER DAY
WAITER/ESS.......................................USD 3.50 PER PASSENGER PER DAY
ASSISTANT WAITER/ESS......................USD 2.00 PER PASSENGER PER DAY

NBI  RCCL WILL PAY THE DIFFERENCE UPON RECEIPT OF AN ACCOUNTING FROM EMPLOYEE
ACCEPTABLE TO RCCL SHOULD THE TOTAL OF MONTHLY GRATUITIES AND THE 50 USD PAID BY
THE EMPLOYER FALLSHORT OF THE MINIMUM INCOME GUARANTEED,
REF. ARTICLE 2.2, I.E. 872 DOLLARS, EFFECTIVE JULY 1, 2003.

October 15, 2007

# Royal Caribbean International - Wage Table

Appendix XX - Hotel Group D - 2008

| 1 | Factor | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Pension Plan | T&D | Internet Access | Total ITF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  | Benefit Value | | | |
|  |  |  |  |  |  |  |  |  | 9 | 10 | 11 | 12 |
| SENIOR OFFICER ATTENDANT | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| HEAD CLEANER | 0.650 | $316 | $159 | $139 | $614 | $38 | $10.54 | $2.74 | $60 | $30 | $20 | $762 |
| CLEANER SUPERVISOR | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| CLEANER | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| STAFF / OFFICER ATTENDANT | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| HEAD POOL ATTENDANT | 0.650 | $316 | $159 | $139 | $614 | $38 | $10.54 | $2.74 | $60 | $30 | $20 | $762 |
| POOL ATTENDANT | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| LINENKEEPER ASSISTANT | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| HEAD CAFÉ ATTENDANT | 0.650 | $316 | $159 | $139 | $614 | $38 | $10.54 | $2.74 | $60 | $30 | $20 | $762 |
| CAFÉ ATTENDANT | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| ROOM SERVICE ATTENDANT | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| HEAD BELL ATTENDANT | 0.650 | $316 | $159 | $139 | $614 | $38 | $10.54 | $2.74 | $60 | $30 | $20 | $762 |
| BELL ATTENDANT | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| CRUISE DIRECTOR ATTENDANT | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| BAR UTILITY | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| CULINARY UTILITY | 0.650 | $316 | $159 | $139 | $614 | $38 | $10.54 | $2.74 | $60 | $30 | $20 | $762 |
| HEAD UTILITY | 0.650 | $316 | $159 | $139 | $614 | $38 | $10.54 | $2.74 | $60 | $30 | $20 | $762 |
| UTILITY | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| PROVISION / STOREKEEPER UTILITY | 0.650 | $316 | $159 | $139 | $614 | $38 | $10.54 | $2.74 | $60 | $30 | $20 | $762 |
| MESS ATTANDANT | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| DINING ROOM CLEANER | 0.600 | $292 | $147 | $128 | $566 | $35 | $9.73 | $2.53 | $60 | $30 | $20 | $711 |
| CATERING TRAINEE | 0.440 | $214 | $107 | $94 | $415 | $26 | $7.14 | $1.86 | $60 | $30 | $20 | $551 |

Above values are all in US Dollars
1.   POSITION TITLE
2.   MONTHLY BASIC PAY FOR 40 HOURS PER WEEK
3.   MONTHLY COMPENSATION FOR WORK BETWEEN 40 AND 56 HOURS PER WEEK
4.   MONTHLY COMPENSATION FOR 60.62 GUARANTEED OVERTIME HOURS PER MONTH
5.   TOTAL MONTHLY GUARANTEED PAY for 303.10 HOURS OF WORK PER MONTH
6.   MONTHLY COMPENSATION FOR 3 DAYS VACATION PAY
7.   SICK PAY PER DAY
8.   EXTRA OVERTIME RATE PER HOUR FOR WORK PERFORMED IN ADDITION TO THE GUARANTEED OVERTIME HOURS
9.   ADDITIONAL NON COMPENSATION BENEFIT FOR PENSION PLAN
10.  ADDITIONAL NON COMPENSATION BENEFIT FOR TRAINING AND DEVELOPMENT
11.  ADDITIONAL NON COMPENSATION BENEFIT FOR INTERNET ACCESS
12.  ADDITIONAL NON COMPENSATION BENEFITS + BASE PAY



November 14, 2007

# <u>Annex 5, 6, and 7</u>

## Material Policies

Annex 5:   Shipboard Drug and Alcohol Policy (SQM HR Section 6.05)

Annex 6:   Harassment, Inappropriate Guest Interaction and Zero Tolerance Policies (SQM HR Section 6.04)

Annex 7:   Progressive Discipline Process (SQM HR Section 6.07) and Employment Termination / Dismissal (SQM HR Section 6.08)

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008

 RoyalCaribbean ®
**I N T E R N A T I O N A L**

# RCL (UK) LTD.

(manual section is applicable for above companies)

**HUMAN RESOURCES**                                    Revision 12 :  September/13/2007
**Chapter 6 – Recognition, Assessments**
**and Disciplinary Action**

### 6.05  Shipboard Drug and Alcohol Policy

 ## Policy

**6.05.01 Policy**
**This policy applies to all officers, staff and crew, including concessionaires.**

- No crewmember shall use, possess, sell or assist in the sale or distribution of illegal drugs.
- No crewmember may consume or otherwise use alcohol while on duty.
- No watchkeeping employees, or any employee holding a position as described in the Safe Manning Certificate, shall consume alcohol or any other intoxicating or anaesthetizing substance within **8 (eight)** hours of the start of duty.
- No on-duty crewmember shall have a blood alcohol content (BAC) above .04%.
- No off-duty crewmember shall have a blood alcohol content (BAC) above .08%.  Any crewmember found to have a BAC in excess of either of these limits, while either respectively on or off duty, shall be in violation of this policy and shall be relieved from duty and subject to immediate termination.
- Employees may enjoy alcoholic beverages including beer, wine and spirits in designated employee lounges.  Employees who are permitted to socialize in designated areas may also enjoy alcoholic beverages in public lounges.
- Testing of an employee can be required by the company during the following circumstances:

1. Pre-Hire
2. Random Testing
3. At any time of an accident or near-accident
4. At any other time the Master has reasonable cause to require testing

Testing shall be required after stabilization of a serious marine accident.

**6.05.02  Management's Responsibility**

**It is the policy of Royal Caribbean Cruises Ltd. that all Managers are responsible for the enforcement of and compliance with the company drug and alcohol policy.  Every Royal Caribbean Cruises Ltd. Manager has an affirmative obligation to address any known or suspected violation of the company's drug and alcohol policy.  Managers who knowingly choose not to address violations or potential violations of the company's drug and alcohol policy will be subject to disciplinary action up to and including termination of employment.**

Management always has the responsibility to ensure safe environment for both guest and crew. Therefore, management needs to ensure that all crew are properly trained and are following the approved procedures when serving alcohol to guests. All employees need to use reasonable judgment on how intoxicated and/or how old a guest is before serving alcohol. If a crewmember sees a guest that exhibits signs of intoxication (passed out, difficulty walking, slurred speech, etc) they need to immediately inform ship's security.

**6.05.03  Policy Violations**
Any employee who violates this policy may be subject to disciplinary action up to and including immediate termination of employment.

 **Guidance**

**6.05.04  Background**

Drug and alcohol abuse and its effects are significant social problems which also could cause safety concerns for the shipping industry, resulting in accidents, damage to property, morale problems and other security risks. International and national shipping administrations have recognized these potential problems and have issued recommendations and legislation regarding control of drugs and alcohol onboard ships.

The U.S. Government has requested the shipping companies' assistance with the investigation of drug smuggling including testing of crewmembers and certain other control procedures such as search of the crewmembers' cabins and personal effects. U.S. Customs has established agreements with the shipping companies with ships that regularly call on U.S. ports to ensure that the U.S. laws are followed.

Royal Caribbean International supports all Flag states and other lawful authorities in their efforts to reduce drug and alcohol abuse in the shipping environment.

The safety and protection of our guests, crew, ship and environment is of vital concern to Royal Caribbean International. We believe in taking every reasonable action to prevent accidents and the pollution of our oceans. Keeping our ships free from drug and alcohol abuse is an important part of our safe operations.

Royal Caribbean Cruises Ltd. has established a comprehensive alcohol and drug policy. The objective of this policy is to provide shipboard employees with a fundamental knowledge of what Royal Caribbean Cruises Ltd. expects from its employees regarding the use of drugs and alcohol.

**6.05.05  Information**

The Hiring Partner should give information regarding this policy to newly hired employees before signing on a ship.  Information regarding this policy and drug and alcohol awareness training is also delivered onboard each ship.

### 6.05.06  Testing

Testing of an employee can be required by the company during the following circumstances:

### 6.05.06a  Pre-Hire

Royal Caribbean Cruises Ltd. or Royal Caribbean Cruises Ltd.'s Hiring Partners, may require any candidate for shipboard employment to be tested for drugs and/or alcohol as a condition of their employment.  Candidates refusing a test or who test positive will not be employed.

### 6.05.06b  Random Testing

The company may require random drug testing of all employees. Such testing will be carried out in compliance with internationally accepted procedures regarding collection and testing procedures, integrity and identity of specimens, laboratory requirements, chain of custody and review of results.  The timing of random testing shipboard will be at the discretion of the Vice President of Human Resources.

### 6.05.06c  At any time of an accident or near accident:

In case of an accident or near accident, the company or a regulatory enforcement official may require each crew member who was directly involved in the accident or near accident to be tested for evidence of drugs or alcohol.

After a serious marine accident chemical testing regulations require:

- Any individual engaged or employed on board a vessel who is involved in a serious marine incident **must be tested for drugs and alcohol.**
- Alcohol testing must be conducted within **2 hours** of when the serious marine incident occurred. This is to be done when the event is stabilized and the testing is deemed safe to be completed.
- Drug testing must be conducted within **32 hours** of when the serious marine incident occurred.
- **The definition of a serious marine incident is:**

  1. **One or more deaths;**
  2. **An injury that requires medical treatment beyond first aide;**
  3. **Damage to property over $ 100,000;**
  4. **Actual or constructive loss the vessel;**
  5. **Discharge of 10,000 gallons or more of oil to sea;**
  6. **A reportable discharge of a hazardous substance or release of reportable quantities of hazardous material into the environment.**

### 6.05.06d  At any other time the Master has reasonable cause to require testing:

Human Resources - 6.05  (Revision 12 - 09/13/2007)

The Master may, whenever there is a reasonable cause, require any shipboard employee to be tested for evidence of drugs or alcohol.  When a member of the management team feels there is reasonable cause to support the testing of any employee, a request along with any applicable supporting evidence must be made to the ship's master. The Master, at his own choosing, will then either approve or deny the request for the testing based on the provided evidence.

The Master may also, at his discretion, delegate authority for ordering an alcohol screening to another member of the senior management team (Staff Captain, Hotel Director, Chief Engineer.) When delegating this authority to another member of the senior management team, it is the Master's responsibility to ensure that the designated senior management team member is fully versed in the company's alcohol policy and testing procedures.

Individuals who refuse to submit to a test when requested to do so, will be removed from duty and may be immediately terminated.

**6.05.07 Shipboard Alcohol Testing procedures:**

The Master must be notified of all onboard testing. The Master or the Staff Captain must approve all testing.

Each vessel will be provided with SD-2 alcohol breath test unit.  These test units are to be kept with the Security Officer and will be used for all on-board alcohol screenings.

Testing onboard will be done by one of the ship's Security Officer or by an acknowledged testing organization or laboratory.  Testing will be witnessed by the Staff Captain or his/her designee, the HR Manager and another ship's officer.

The test is to be administered per instructions.

The authorized limits for employees are as follows:

Employees on duty: Maximum limit: 0.04% (includes watchkeepers)
Employees off-duty: Maximum limit: 0.08%.

The testing for alcohol abuse onboard will normally be done by use of the SD-2 alcohol breath test system.  If the test results are inconclusive or questionable, a second test should be taken by the Medical center staff.

Testing for potential drug abuse will normally be done by urine test, but may be done by a blood test. Employees are required to provide blood specimens when directed to do so by the company or a regulatory enforcement official.

All testing and medical records must be kept strictly confidential. The results of the test may only be used by the Ship's Master in determining possible employee disciplinary action.

Royal Caribbean Cruises Ltd. recognizes alcohol dependency as a treatable condition. Our aim in voluntary disclosure will be to guide or employees to seek professional help for rehabilitation. Individually suited measures may be considered.

## 6.05.08 Tools

**6.05.08a Operations Check List -** The basic "nuts and bolts" , step-by-step training and procedure guidelines for using the alcohol breath testing instrument. This should be reviewed often by every employee conducting alcohol breath tests.

### Intoxilyzer SD-2 Operations Checklist

I



Intoxilyzer SD-2 Operations Checklist.doc

**6.05.08b Log Book** - Examples of the QA Log Book, Employee Training Log and basic instruction hand-outs are included.

### Alcohol Testing Log Book



Alcohol Testing Log Book.pdf

**6.05.08c Intoxilyzer SD-2 Training and QA Doc** . - This attachment provides a plan for training an employee to conduct alcohol breath tests on the SD-2 unit and documenting that training. Re-certification should be completed every 5 years if the employee will be conducting alcohol breath tests. Instructions on how to establish an Quality Assurance Log Book for each instrument are also part of this document.

### Intoxilyzer SD-2 Training and Q&A



Intoxilyzer SD-2 Training and Q&A.doc

**6.05.08d Intoxilyzer Test Result Form** - This attachment should be used when completing all alcohol breath tests. The form should be completed and filed.

### Intoxilyzer Test Result Form



Intoxilyzer Test result form.doc

**6.05.08e Certification -** On completion of certification with the SD-2 Intoxilyzer as outlined in

the training document 6.05.08c, the Security Officer is to be issued with the below certificate. This is to be issued after verification of the Breath Alcohol Technician Training log in 6.05.08b.

**Test Certificate**



NEW INTOXILYZER  Test Certificate.doc

**Related Entries:**

**END OF SECTION**

  RCL (UK) LTD.

(manual section is applicable for above companies)

**HUMAN RESOURCES**                                   Revision 12 : September/13/2007

**Chapter 6 - Recognition, Assessments**
**and Disciplinary Action**
    6.04  Harassment, Inappropriate Guest Interaction and Zero Tolerance Policies

 **Policy**

*Harassment*

Royal Caribbean International and Celebrity Cruises (The Company) is committed to making our workplaces safer for employees and guests. A 'safe' workplace is one that is free of intimidation and harassment. The purpose of this policy is to clearly explain:

What we mean by 'harassment'.
What harassment looks like, and
What could happen if you are accused of harassment?

Definition: Harassment

Harassment, as defined for this policy, means verbal or physical conduct that demeans or shows hostility or prejudice toward an individual because of his/her gender, sexual preference, race, religion, color, national origin, age or disability, or that of his/her relatives, friends or associates.

Harassment creates an intimidating, hostile or offensive work environment.
It can make it difficult for a person to perform their normal work duties.
Victims of harassment may also be held back from other job opportunities.

Receiving appropriate job performance feedback, counseling or direction from your supervisor is not considered harassment. If you object to the manner in which the feedback is provided, you may request a review with the department head.

What Is Sexual Harassment?

'Sexual' harassment is a type of harassment. It means unwelcome sexual advances, requests for sexual favors or other verbal, written or physical conduct of a sexual nature when it is made explicitly or implicitly a term or condition of employment, is used as a basis for employment decisions, or unreasonably interferes with an individual's work performance or creates an offensive work environment.

Human Resources - 6.04  (Revision 12 - 09/13/2007)

Sexual harassment does not refer to occasional compliments of a socially acceptable nature. It refers to behavior that is not welcome, that is personally offensive, that fails to respect the rights of others, that lowers morale and that interferes with work effectiveness.

The following behaviors are examples of sexual harassment and will not be tolerated:

Derogatory, degrading and/or offensive comments about someone's gender or sexual orientation. This includes inappropriate jokes, stories or retelling of experiences.
Bringing physical objects or materials of a sexual nature into the workplace.  This includes photographs, posters, calendars, or other graphic materials.
Using indecent language in the presence of a co-worker.
Touching co-workers in ways that may be considered 'sexual' or 'inappropriate'.
Pursuing an intimate relationship with a co-worker who does not reciprocate that interest.  You should accept his/her decision and maintain a respectful working relationship.

If you feel you are being harassed you should immediately tell the person harassing you the behavior is unwelcome and must stop.  If the harassment does not stop, follow the guidelines below for reporting harassment.

Reporting Harassment

Here are the appropriate steps to take for reporting harassment:

All employees report incidents to their department heads.
**Shipboard** department heads report to the Staff Captain.
**Shoreside** department heads report to the Vice President of Human Resources.

If a complaint involves the employee's department head or if the employee has reported an alleged violation to the department head and employee does not believe that the department head has taken appropriate action, then the employee should act as follows:

**Shipboard** employees should report the alleged act to the Staff Captain.
**Shoreside** employees should report the matter to the Vice President, Human Resources.

What Happens When A Complaint Is Filed?

All inquiries or complaints will be investigated promptly, thoroughly, and as confidentially as possible for the protection of both the employee and the accused.

If an investigation confirms that harassment has occurred, the Company will take appropriate corrective action.
If the harassment involves someone who is not an employee, the Company will take appropriate action within its control.
You will never be punished for reporting harassment, as long as your report is honest.

Any manager or supervisor who is made aware of sexual harassment and fails to take corrective action according to this policy will be subject to discipline.  Any manager or supervisor who retaliates against an employee for reporting a claim of harassment will be dismissed.

### *Inappropriate Guest Interaction*

<u>Sexual Contact or Intimacy with Guests Is Not Permitted</u>

Our professional relationship with our guests makes it absolutely necessary that we conduct ourselves appropriately at all times.  Sexual contact or intimacy with guests is never acceptable.  This includes the following behaviors:

Having any sexual contact with guests even if guests agree.
Offering sexual favors of any kind to guests.
Accepting guests' sexual advances.

All of these behaviors violate Company policy.  If you have sexual contact with guests you can be dismissed immediately.   This policy applies to all employees when onboard Company vessels or ground properties owned or leased by the Company.

Having sexual relations with minors, sexual assault and rape are all crimes, punishable by law.  All allegations of sexual contact with minors and sexual assault and rape will be investigated and reported by the Company to the proper legal authorities and will be prosecuted to the fullest extent allowed by the law.  This is further explained below in the 'Zero Tolerance Policy' on Crime.

<u>Avoid Problem Situations</u>

The following guidelines are for the protection of you and our guests.  These guidelines will be strictly enforced.  Following them at all times will also keep you safe from charges of assault from guests:

Never allow guests into employee quarters, other than for a legitimate business purpose.
Never allow guests to attend employee parties.
Never enter a guest stateroom without proper authorization.  There are no exceptions.  Any employee found in a guest stateroom who is not fulfilling a guest accommodation (i.e. stateroom service, stewarding, or maintenance personnel) shall be dismissed immediately.
Never use guest elevators unless in the line of duty.

<u>Safe Practices</u>

Always treat guests with respect and courtesy.  However, you should immediately report sexually aggressive individuals or guests to your supervisor or department head.

Always politely offer to contact security if a guest requests an escort back to his/her stateroom.
Always tell the Bridge Officer if any guest is intoxicated and incapacitated.  The Security Officer or any member of the security staff will be called to assist.
Always avoid touching guests in ways that may be considered 'sexual' or 'inappropriate'.
Always avoid contact with guests who are physically aggressive or violent.  If a guest becomes violent with you, leave the scene and tell a member of the security staff.

*Management Accountability:*

If an employee violates the policies, the employee's supervisor, manager and department head will be required to provide the Captain with information regarding what actions they took to prevent the violation, e.g. employee counseling, crew education, etc.

*Zero Tolerance Policy on Crime*

Royal Caribbean International and Celebrity Cruises, in cooperation with our industry association the International Council of Cruise Lines, have established a 'Zero Tolerance Policy on Crime'.   The policy establishes guidelines for reporting allegations of serious crimes committed onboard our ships to appropriate law enforcement authorities.  A serious crime is generally defined as a felony, which would include sexual contact with minors, or assault, rape or battery.

The reporting process is as follows:

o  Serious crimes committed on the high seas against or by an U.S. citizen will be reported to the U.S. Federal Bureau of Investigation, (F.B.I.)
o  Serious crimes committed on the high seas against a non-U.S. citizen will be reported to the appropriated authorities at the vessel's next port of call.
o  Serious crimes committed while the vessel is in another sovereign state's territorial waters will be reported to the appropriate authorities if the vessel is making a port visit in that country. If the crime was committed by or against a U.S. citizen the crime will also be reported to the local U.S. Consulate and the F.B.I. in the U.S.
o  Serious crimes committed on the high seas against or by a U.S. citizen when the vessel is not returning to the U.S. during that voyage, will be reported to the local U.S. Consulate (next port of call) and the F.B.I. in the U.S.
o  At any time a victim requests further action after the incident has been reported, they should be given the phone number and/or address of the law enforcement agency for an explanation as to the disposition of their case.

Risk Management in Miami will handle the notification process.



Harassment Signature.dc

**Related Entries:**

END OF SECTION

 RCL (UK) LTD.

(manual section is applicable for above companies)

**HUMAN RESOURCES**                                      **Revision** 12 :  September/13/2007
**Chapter 6 - Recognition, Assessments
and Disciplinary Action**

**6.07  Progressive Discipline Process**

 **Policy**

Shipboard regulations apply to all officers, staff and crew, collectively referred to as "Employees" from here on.

Degrees of discipline are generally progressive and are used to ensure that the employee has the opportunity to correct his/her performance or behavior.  Where severe policy violations have occurred, the management may issue a Written Warning up to and including a recommendation for Master's Hearing without prior coaching and/or verbal counseling. Please see **Shipboard Rules and Regulations**.  At any time, the Staff Captain may issue a discipline action directly to the employee for violations in cases of safety, security and any type of violence towards a guest or crew.  The Staff Captain is responsible to enter it in Encore and notify the employee's immediate supervisor and the HR Manager.

Written Warnings are only valid if signed by the Division and Department Head and the HR Manager.  Warnings and Counselings are active 12 months from the date of issue. Three (3) written warnings within a 12-month period require a mandatory Master's Hearing.

**Ongoing Coaching**
Management is responsible for providing ongoing coaching when faced with employee's unsatisfactory job performance.  Management should document all coaching conversations in the attached form (Performance Opportunity Log) and keep it in the employee's file. Three or more of the same type of incident requires the creation of an Employee Action Plan. The Action Plan is to be jointly developed between the Immediate Supervisor and the employee.

**Performance Opportunity Log**



Performance Opportunity Log.doc

**Employee Action Plan**

**Verbal Counseling**

After given an opportunity to improve, if the unsatisfactory behavior/ performance continues, the Supervisor will discuss it with the employee and issue a counseling.  The Verbal Counseling is used for minor policy or performance offenses.  The following are some examples of circumstances, but not limited to, when a Verbal Counseling may be issued:

- Unsatisfactory/poor job performance
- Not completing assigned tasks without valid explanation and/or missed deadline
- Late arrival for duty or leaving work early without permission
- Negative behavior which interferes with his/hers job performance or the performance of others
- Inability to cooperate with fellow employees
- Smoking in unauthorized areas
- Failure to adhere to uniform dress code
- Loss of crew card/seapass

## Written Warning

If an employee continues to break the rules, ignores policies and procedures and continues to perform below standard, a Written Warning may be issued. The Written Warning is only valid if signed by Division and Department Head and HR Manager.  The following are some examples of circumstances, but not limited to, when a Written Warning may be issued:

- Misconduct
- Repetitive loss of crew card/seapass
- Late onboard
- Unauthorized use of guest areas
- Failure to comply with safety rules and wear safety equipment
- Failure to attend safety drills or mandatory training
- Cabin not kept clean as per Master's inspections
- Failure to report injury or accident to self or others
- Threatening or abusive language towards other employees, including supervisor
- Failure to comply with Customs, Immigration or Agricultural laws
- Failure to report to Crew Office when signing on
- Deliberate misuse or damage to company's property
- Insubordination-refusal to follow supervisor's lawful orders
- Solicitation of tips or excellent ratings
- Repeated unsatisfactory job performance

The Employee Discipline Form is to be used for both Verbal Counsellings and Written Warnings.  Copies of all discipline actions are to be  provided to the Staff Captain, HR Manager, Employee and Division Head.

## Employee Discipline Form



Employee Discipline Form.doc

## Guidance

All progressive disciplinary actions should be originated by the Immediate Supervisor. They should be discussed with the employee within 24 hours and entered into the system within 48 hours of the occurrence, unless further investigation is required as determined by the Staff Captain and/or HR Manager .

If the discipline progresses to the 3rd. Written Warning, the Immediate Supervisor will discuss it with the HR Manager, obtain Division and Department Head's signature and issue the 3rd. Written Warning to the employee. The Supervisor shall enter it into Encore and send it to the HR Manager, noting that it's 3rd. Written Warning. The HR Manager will research the employee's file on the system and compile a Report to Master within 24 hours of receipt, unless further investigation is required. It is the Master's decision, upon review of the report and any supporting documents to proceed to a Master's Hearing. Refer to policy 6.08, 📄 for the process.

- Gather facts from all involved
- See the person concerned privately within 24 hours of the occurrence, unless further investigation is required.
- Outline facts to the employee and ask for an explanation.
- Make a decision whether a counseling or warning is justified. If unsure of the procedures, consult the HR Manager for clarification.
- Review the employee's computer file for the last 12 months record.
- Present the Discipline Form (signed by all required) and ask the employee to write their comments and sign it. If the employee refuses to sign, note it on the form.
- Agree on an action plan and a period over which improvement is expected. Make use of the Employee Development Plan from the Performance Appraisal Form and provide the employee with a copy.
- Advise the employee than any further violation will lead to further disciplinary actions, up to and including Master's Hearing.
- Verbal Counseling's and Written Warnings are entered in Encore by the Immediate Supervisor within 48 hours after they've been issued to the employee.

Consult the HR Manager prior to execution, to clarify the process, wording or merits of the case.

Signed copies are to be submitted to  Staff Captain, Division Head, Employee, HR Manager and shoreside HR. The HR Manager shall forward a copy to Shoreside HR. The HR Manager shall keep the original and all other relevant documents (Statements, Employee Development Plans, Investigation Reports, etc.) on file for minimum of 12 months, after which, they are sent to Shoreside HR Fleet Operations for filing.



The Shipboard Human Resources Manager is responsible to ensure that the progressive disciplinary process is followed and all documents are reviewed for accuracy and consistency. The ultimate management of the Progressive Discipline Process is responsibility of the Vice President of Human Resources.

**Related Entries:**
Human Resources Employment Termination/Dismissal 6.08

**END OF SECTION**



# RCL (UK) LTD.

(manual section is applicable for above companies)

**HUMAN RESOURCES**                                      Revision 12 :  September/13/2007
**Chapter 6 - Recognition, Assessments**
**and Disciplinary Action**
### 6.08  Employment Termination/Dismissal



# Policy

### 6.08.01  Master's Hearing Procedures

In the event the Master determines the employment of a shipboard crewmember may be terminated, whether for job performance or for disciplinary reasons, a Master's Hearing will be held before the crewmember is terminated and signs-off the ship.

**It is the Master's decision to hold a hearing based on available facts and interpretation of them, as presented in the Human Resources Manager's Report.**

The Human Resources Manager will prepare a "Report to Master", gathering all facts from the crewmember and any witnesses.  The Human Resources Manager will compile the crewmember's prior disciplinary record and crewmember's history with the company.

The Master Hearing must be attended by a Committee, which includes: Master, Staff Captain, Hotel Director or Chief Engineer; crewmember, Human Resources Manager, and the Division Head (Immediate Supervisor as needed).  The Master may request other persons to attend the Hearing at his/her discretion. The employee may elect to bring his/her own representative to the Master's Hearing.

At the hearing, the Master shall question the crewmember and any witnesses who might be able to provide information in the case.  The remaining members of the Committee may ask questions.  The Human Resources Manager will provide advice and counsel on any applicable collective bargaining agreements (CBA) and will act as an impartial party to the process, to ensure that the crewmember gets a fair and objective review of the circumstances.  The Master shall ask the Committee for their feedback before making a final decision.

When the Master makes a decision, he/she must inform the crewmember and state the ground for it.  The decision shall be entered on the Master's Hearing Form, as well as the crewmember and any witness's statements.  All in attendance must sign the form. In case of a dismissal, the Division Head will enter the termination into Encore/Enterprise-One before the crewmember departs the ship.

### Report to Master Form

Human Resources - 6.08  (Revision 12 - 09/13/2007)



Report to Master - Blank.doc

### 6.08.02  Termination of a Concessionaire Crewmember

Crewmembers employed by the company's Revenue Partners, may be terminated through a Master's hearing due to policy violation. The Revenue Partner involved is responsible to address and correct any job performance issue of their employee through their company internal performance management system.

The following is the procedure for disciplinary actions taken with crew members working for any of our revenue partners (including: Starboard, Steiner, Onboard Media, Park West, Image, Australian Airbrush Tattoos) onboard Royal Caribbean International ships:

- For any disciplinary actions taken toward these crew members, both the Division Head (Marketing and Revenue Manager) and the Revenue Manager from the revenue partner company (e.g. Retail Manager, Spa Manager) must be informed and provided with copies of any documentation relating to the incident.
- Both the Division Head (Marketing and Revenue Manager) and Revenue Manager (e.g. Retail Manager, Spa Manager) must be invited to attend all disciplinary proceedings, including Master's Hearings relating to the incident.
- Following any disciplinary actions, the Revenue Manager will receive all related documentation and has the responsibility to forward all documentation to their shoreside HR departments.
- In the event that disciplinary action is taken against the Revenue Manager, the ship's M&R Manager will be responsible for contacting both the Account Manager for that revenue partner in the onboard revenue team, as well as the revenue partner's shoreside operations management.
- The Division Head (Marketing and Revenue Manager) will retain copies of all related documentation in their files for a minimum of 12 months.

Note:  Revenue Partners have the right to administer disciplinary action to their employees, up to and including termination. The decision to terminate a Revenue Partner employee by the Revenue Partner must be communicated by their shoreside management.  The Revenue Partner will request authorization for termination through Royal Caribbean International's Onboard Revenue Team by contacting their specific Account Manager.  Approval will be communicated to appropriate members of the ship's executive committee by the respective Manager of Onboard Revenue.

### 6.08.03  Reasons for a Master's Hearing

Terminations/Dismissals for employees onboard will go through Master's Hearing.  The Master can decide to dismiss an employee for two reasons:

**6.08.03a**  First, for **_"Gross Misconduct"_** , when an employee conducts a serious violation of company policies and/or rules and regulations.  Below are examples of violations that may be

considered serious enough for immediate dismissal, however, there may also be other instances leading to dismissal based on the Master's evaluation of actual circumstances.

- Violence against another person, guest or crew
- Smuggling, cooperating or failure to report narcotics traffic
- Dishonesty and /or falsification of company records
- Going to a guest cabin or taking a guest into crew area
- Misconduct towards a guest
- Possession of illegal weapons
- Sexual Harassment or Assault
- Theft of guest, crew or company property
- Violations of company drug and alcohol policy
- Use of another crewmember's crew card
- Arrested ashore for criminal offense
- Unauthorized use of company records
- Contravention of the "Save the Waves" program
- Missing or jumping ship
- Possession of unauthorized electrical appliances or candles
- Tampering with smoke detectors or other safety equipment
- Unauthorized use of galley equipment or cooking appliances

**6.08.03b**  Second, the Master may dismiss any employee for *"Unsatisfactory Job Performance"* . This applies to an employee who has proceeded through the regular Progressive Disciplinary Process (SQM, 6.07)" and is still not meeting the requirements for the position.

A Master's Hearing Form must be completed at the time of the hearing.  All in attendance must sign the form and the "explanation by defendant" must be filled.  The reason for dismissal, including the violation of the policy must be clearly stated on the form.  The HR Manager is responsible to prepare the Master's Hearing form and distribute copies upon conclusion of the hearing.

### Master's Hearing Form

**6.08.04  Termination during Probation**

Newly hired employees are subject to a probation period in accordance with their Collective Bargaining Agreement (CBA) or personal employment agreement.  Termination can take place at **any time** during the probation period.

The Immediate Supervisor and the Division Head must provide documentation of Progressive Discipline previously issued to the employee, written recommendation to terminate employment and Performance Appraisal to the HR Manager.  The HR Manager and Department Head must approve the termination, notify the Master and give a letter of termination to the employee.

### Letter of Termination During Probation

## 6.08.05  Termination by Shoreside  Management

In special circumstances, corporate management may take disciplinary action up to and including termination of employment of shipboard employees.  The decision to dismiss can result from an employee serious violation of company policy or from an employee not showing enough improvement after a documented progressive discipline has taken place.

Termination for officers with 2 ½ stripes and above must be initiated in writing by the shoreside Director or Vice President of the functional unit, who will inform the Department Head shipboard.  The termination letter must be approved and signed by the Director of Fleet Employee Relations and Performance.

If the employee is onboard, the Department Head in collaboration with the HR Manager must inform the employee in person and give them the letter.  If the employee is not onboard, the termination letter must be mailed "registered" to the employee's home address on file.

In case of termination of employment of Out-Island Employees, the Site Manager of the out-island location will communicate to Shoreside Management the employee's violation. Depending on the severity of violation and steps taken within the progressive disciplinary process, the decision to terminate may be taken by the shoreside functional manager with approval of Fleet Employee Relations and Performance.  It is responsibility of the Site Manager to give the employee a termination letter.

The Termination letter should provide for 7 days notice or 7 days pay in lieu of notice.

## 6.08.06  Close Custody Guidelines for a Dismissed Employee

If a Master's Hearing results in an employee dismissal, the Immediate Supervisor must escort the dismissed shipboard employee from the Master's Hearing to the individual's stateroom accompanied by a Security Guards if deemed necessary.

The Supervisor must be present while the individual packs his/her belongings. It is the responsibility of the Supervisor to ensure the Shipboard Employee does not remove any company property from the vessel. Once all of the individual's belongings have been packed, the Supervisor will escort the Shipboard Employee to the Crew Office.

If the Shipboard Employee is not a US Citizen or Alien Resident Card holder, the Shipboard Employee's I-95 will be returned to the Crew Payroll Manager/Crew Purser.

The Supervisor will hand-over responsibility for the Shipboard Employee to the Security Officer. The Security Officer will accompany the dismissed shipboard employee while still onboard. The Security Officer should be advised when the Port Agent is ready to escort the dismissed shipboard employee from the ship. The Security Officer should arrange for the individual to be escorted to the crew gangway. The Port Agent will sign a receipt accepting responsibility for the

dismissed shipboard employee.

The Shipboard Employee must receive all outstanding wages before disembarkment.

 **Guidance**

### 6.08.07 Notification and Administration

The Division Head must inform by e-mail their shoreside functional area support and their scheduler of the termination. If a senior officer (3-stripe or above) is scheduled for a Master's Hearing, the Department Head should notify the appropriate shoreside functional area Director immediately. The HR Manager must inform the Fleet Employee Relations and Performance Consultant immediately, and send the complete file shore side (Master's Hearing Form, copies of any prior disciplinary actions, performance appraisals, crewmember's and witness statements, etc).

In all cases of terminated employees, the following checklist must be completed by the Immediate Supervisor.

### Recovery of Company Property Checklist

It is responsibility of the shipboard Human Resources Manager to ensure that the record of all shipboard terminations is entered into Encore/EnterpriseOne **before** the employee departs the ship.

The HR Manager must **immediately** send the complete file with all pertinent documents to their shoreside Fleet Employee Relations and Performance Consultant at the next turnaround port.

### HR Manager's Document Checklist



The management and maintenance of the shipboard termination process is the responsibility of the Vice President of Human Resources.

**Related Entries:**
Human Resources Progressive Discipline Process 6.07

Human Resources - 6.08  (Revision 12 - 09/13/2007)

**END OF SECTION**

 RCL (UK) LTD.

(manual section is applicable for above companies)

**HUMAN RESOURCES**　　　　　　　　　　**Revision** 12 : September/13/2007
**Chapter 6 - Recognition, Assessments
and Disciplinary Action**
**6.05  Shipboard Drug and Alcohol Policy**

 ## Policy

**6.05.01 Policy**
**This policy applies to all officers, staff and crew, including concessionaires.**

- No crewmember shall use, possess, sell or assist in the sale or distribution of illegal drugs.
- No crewmember may consume or otherwise use alcohol while on duty.
- No watchkeeping employees, or any employee holding a position as described in the Safe Manning Certificate, shall consume alcohol or any other intoxicating or anaesthetizing substance within **8 (eight)** hours of the start of duty.
- No on-duty crewmember shall have a blood alcohol content (BAC) above .04%.
- No off-duty crewmember shall have a blood alcohol content (BAC) above .08%.  Any crewmember found to have a BAC in excess of either of these limits, while either respectively on or off duty, shall be in violation of this policy and shall be relieved from duty and subject to immediate termination.
- Employees may enjoy alcoholic beverages including beer, wine and spirits in designated employee lounges.  Employees who are permitted to socialize in designated areas may also enjoy alcoholic beverages in public lounges.
- Testing of an employee can be required by the company during the following circumstances:

1. Pre-Hire
2. Random Testing
3. At any time of an accident or near-accident
4. At any other time the Master has reasonable cause to require testing

Testing shall be required after stabilization of a serious marine accident.

**6.05.02  Management's Responsibility**

**It is the policy of Royal Caribbean Cruises Ltd. that all Managers are responsible for the enforcement of and compliance with the company drug and alcohol policy.  Every Royal Caribbean Cruises Ltd. Manager has an affirmative obligation to address any known or suspected violation of the company's drug and alcohol policy.  Managers who knowingly choose not to address violations or potential violations of the company's drug and alcohol policy will be subject to disciplinary action up to and including termination of employment.**

Management always has the responsibility to ensure safe environment for both guest and crew.  Therefore, management needs to ensure that all crew are properly trained  and are following the approved procedures when serving alcohol to guests.  All employees need to use reasonable judgment on how intoxicated and/or how old a guest is before serving alcohol.  If a crewmember sees a guest that exhibits signs of intoxication (passed out, difficulty walking, slurred speech, etc) they need to immediately inform ship's security.

**6.05.03  Policy Violations**
Any employee who violates this policy may be subject to disciplinary action up to and including immediate termination of employment.



RCL (UK) LTD.

(manual section is applicable for above companies)

**HUMAN RESOURCES**                                Revision 12 :  September/13/2007
**Chapter 6 - Recognition, Assessments**
**and Disciplinary Action**
    **6.04  Harassment, Inappropriate Guest Interaction and Zero Tolerance Policies**

  **Policy**

*Harassment*

Royal Caribbean International and Celebrity Cruises (The Company) is committed to making our workplaces safer for employees and guests.  A 'safe' workplace is one that is free of intimidation and harassment.  The purpose of this policy is to clearly explain:

What we mean by 'harassment'.
What harassment looks like, and
What could happen if you are accused of harassment?

Definition:  Harassment

Harassment, as defined for this policy, means verbal or physical conduct that demeans or shows hostility or prejudice toward an individual because of his/her gender, sexual preference, race, religion, color, national origin, age or disability, or that of his/her relatives, friends or associates.

Harassment creates an intimidating, hostile or offensive work environment.
It can make it difficult for a person to perform their normal work duties.
Victims of harassment may also be held back from other job opportunities.

Receiving appropriate job performance feedback, counseling or direction from your supervisor is not considered harassment.  If you object to the manner in which the feedback is provided, you may request a review with the department head.

What Is Sexual Harassment?

'Sexual' harassment is a type of harassment.  It means unwelcome sexual advances, requests for sexual favors or other verbal, written or physical conduct of a sexual nature when it is made explicitly or implicitly a term or condition of employment, is used as a basis for employment decisions, or unreasonably interferes with an individual's work performance or creates an offensive work environment.

Sexual harassment does not refer to occasional compliments of a socially acceptable nature. It refers to behavior that is not welcome, that is personally offensive, that fails to respect the rights of others, that lowers morale and that interferes with work effectiveness.

The following behaviors are examples of sexual harassment and will not be tolerated:

Derogatory, degrading and/or offensive comments about someone's gender or sexual orientation. This includes inappropriate jokes, stories or retelling of experiences.
Bringing physical objects or materials of a sexual nature into the workplace.  This includes photographs, posters, calendars, or other graphic materials.
Using indecent language in the presence of a co-worker.
Touching co-workers in ways that may be considered 'sexual' or 'inappropriate'.
Pursuing an intimate relationship with a co-worker who does not reciprocate that interest.  You should accept his/her decision and maintain a respectful working relationship.

If you feel you are being harassed you should immediately tell the person harassing you the behavior is unwelcome and must stop.  If the harassment does not stop, follow the guidelines below for reporting harassment.

Reporting Harassment

Here are the appropriate steps to take for reporting harassment:

All employees report incidents to their department heads.
**Shipboard** department heads report to the Staff Captain.
**Shoreside** department heads report to the Vice President of Human Resources.

If a complaint involves the employee's department head or if the employee has reported an alleged violation to the department head and employee does not believe that the department head has taken appropriate action, then the employee should act as follows:

**Shipboard** employees should report the alleged act to the Staff Captain.
**Shoreside** employees should report the matter to the Vice President, Human Resources.

What Happens When A Complaint Is Filed?

All inquiries or complaints will be investigated promptly, thoroughly, and as confidentially as possible for the protection of both the employee and the accused.

If an investigation confirms that harassment has occurred, the Company will take appropriate corrective action.
If the harassment involves someone who is not an employee, the Company will take appropriate action within its control.
You will never be punished for reporting harassment, as long as your report is honest.

Human Resources - 6.04 (Revision 12 - 09/13/2007)

Any manager or supervisor who is made aware of sexual harassment and fails to take corrective action according to this policy will be subject to discipline. Any manager or supervisor who retaliates against an employee for reporting a claim of harassment will be dismissed.

### *Inappropriate Guest Interaction*

<u>Sexual Contact or Intimacy with Guests Is Not Permitted</u>

Our professional relationship with our guests makes it absolutely necessary that we conduct ourselves appropriately at all times. Sexual contact or intimacy with guests is never acceptable. This includes the following behaviors:

Having any sexual contact with guests even if guests agree.
Offering sexual favors of any kind to guests.
Accepting guests' sexual advances.

All of these behaviors violate Company policy. If you have sexual contact with guests you can be dismissed immediately. This policy applies to all employees when onboard Company vessels or ground properties owned or leased by the Company.

Having sexual relations with minors, sexual assault and rape are all crimes, punishable by law. All allegations of sexual contact with minors and sexual assault and rape will be investigated and reported by the Company to the proper legal authorities and will be prosecuted to the fullest extent allowed by the law. This is further explained below in the 'Zero Tolerance Policy' on Crime.

<u>Avoid Problem Situations</u>

The following guidelines are for the protection of you and our guests. These guidelines will be strictly enforced. Following them at all times will also keep you safe from charges of assault from guests:

Never allow guests into employee quarters, other than for a legitimate business purpose.
Never allow guests to attend employee parties.
Never enter a guest stateroom without proper authorization. There are no exceptions. Any employee found in a guest stateroom who is not fulfilling a guest accommodation (i.e. stateroom service, stewarding, or maintenance personnel) shall be dismissed immediately.
Never use guest elevators unless in the line of duty.

<u>Safe Practices</u>

Always treat guests with respect and courtesy. However, you should immediately report sexually aggressive individuals or guests to your supervisor or department head.

Always politely offer to contact security if a guest requests an escort back to his/her stateroom.
Always tell the Bridge Officer if any guest is intoxicated and incapacitated.  The Security Officer or any member of the security staff will be called to assist.
Always avoid touching guests in ways that may be considered 'sexual' or 'inappropriate'.
Always avoid contact with guests who are physically aggressive or violent.  If a guest becomes violent with you, leave the scene and tell a member of the security staff.

*Management Accountability:*

If an employee violates the policies, the employee's supervisor, manager and department head will be required to provide the Captain with information regarding what actions they took to prevent the violation, e.g. employee counseling, crew education, etc.

*Zero Tolerance Policy on Crime*

Royal Caribbean International and Celebrity Cruises, in cooperation with our industry association the International Council of Cruise Lines, have established a 'Zero Tolerance Policy on Crime'.   The policy establishes guidelines for reporting allegations of serious crimes committed onboard our ships to appropriate law enforcement authorities.  A serious crime is generally defined as a felony, which would include sexual contact with minors, or assault, rape or battery.

The reporting process is as follows:

o  Serious crimes committed on the high seas against or by an U.S. citizen will be reported to the U.S. Federal Bureau of Investigation, (F.B.I.)
o  Serious crimes committed on the high seas against a non-U.S. citizen will be reported to the appropriated authorities at the vessel's next port of call.
o  Serious crimes committed while the vessel is in another sovereign state's territorial waters will be reported to the appropriate authorities if the vessel is making a port visit in that country. If the crime was committed by or against a U.S. citizen the crime will also be reported to the local U.S. Consulate and the F.B.I. in the U.S.
o  Serious crimes committed on the high seas against or by a U.S. citizen when the vessel is not returning to the U.S. during that voyage, will be reported to the local U.S. Consulate (next port of call) and the F.B.I. in the U.S.
o  At any time a victim requests further action after the incident has been reported, they should be given the phone number and/or address of the law enforcement agency for an explanation as to the disposition of their case.

Risk Management in Miami will handle the notification process.



Harassment Signature.dc

 **RCL (UK) LTD.**

(manual section is applicable for above companies)

**HUMAN RESOURCES**                         **Revision** 12 : September/13/2007
**Chapter 6 - Recognition, Assessments
and Disciplinary Action**

### 6.07  Progressive Discipline Process

 **Policy**

Shipboard regulations apply to all officers, staff and crew, collectively referred to as "Employees" from here on.

Degrees of discipline are generally progressive and are used to ensure that the employee has the opportunity to correct his/her performance or behavior.  Where severe policy violations have occurred, the management may issue a Written Warning up to and including a recommendation for Master's Hearing without prior coaching and/or verbal counseling. Please see **Shipboard Rules and Regulations**.  At any time, the Staff Captain may issue a discipline action directly to the employee for violations in cases of safety, security and any type of violence towards a guest or crew.  The Staff Captain is responsible to enter it in Encore and notify the employee's immediate supervisor and the HR Manager.

Written Warnings are only valid if signed by the Division and Department Head and the HR Manager.  Warnings and Counselings are active 12 months from the date of issue. Three (3) written warnings within a 12-month period require a mandatory Master's Hearing.

**Ongoing Coaching**
Management is responsible for providing ongoing coaching when faced with employee's unsatisfactory job performance.  Management should document all coaching conversations in the attached form (Performance Opportunity Log) and keep it in the employee's file. Three or more of the same type of incident requires the creation of an Employee Action Plan. The Action Plan is to be jointly developed between the Immediate Supervisor and the employee.

**Performance Opportunity Log**



Performance Opportunity Log.doc

**Employee Action Plan**

**Verbal Counseling**

After given an opportunity to improve, if the unsatisfactory behavior/ performance continues, the Supervisor will discuss it with the employee and issue a counseling.  The Verbal Counseling is used for minor policy or performance offenses.  The following are some examples of circumstances, but not limited to, when a Verbal Counseling may be issued:

- Unsatisfactory/poor job performance
- Not completing assigned tasks without valid explanation and/or missed deadline
- Late arrival for duty or leaving work early without permission
- Negative behavior which interferes with his/hers job performance or the performance of others
- Inability to cooperate with fellow employees
- Smoking in unauthorized areas
- Failure to adhere to uniform dress code
- Loss of crew card/seapass

**Written Warning**

If an employee continues to break the rules, ignores policies and procedures and continues to perform below standard, a Written Warning may be issued. The Written Warning is only valid if signed by Division and Department Head and HR Manager.  The following are some examples of circumstances, but not limited to, when a Written Warning may be issued:

- Misconduct
- Repetitive loss of crew card/seapass
- Late onboard
- Unauthorized use of guest areas
- Failure to comply with safety rules and wear safety equipment
- Failure to attend safety drills or mandatory training
- Cabin not kept clean as per Master's inspections
- Failure to report injury or accident to self or others
- Threatening or abusive language towards other employees, including supervisor
- Failure to comply with Customs, Immigration or Agricultural laws
- Failure to report to Crew Office when signing on
- Deliberate misuse or damage to company's property
- Insubordination-refusal to follow supervisor's lawful orders
- Solicitation of tips or excellent ratings
- Repeated unsatisfactory job performance

The Employee Discipline Form is to be used for both Verbal Counsellings and Written Warnings.  Copies of all discipline actions are to be  provided to the Staff Captain, HR Manager, Employee and Division Head.

<u>**Employee Discipline Form**</u>



Employee Discipline Form.doc

 RoyalCaribbean ®
INTERNATIONAL

# RCL (UK) LTD.

(manual section is applicable for above companies)

**HUMAN RESOURCES**                                         **Revision 12 :  September/13/2007**
**Chapter 6 - Recognition, Assessments**
**and Disciplinary Action**
### 6.08  Employment Termination/Dismissal

 **Policy**

**6.08.01  Master's Hearing Procedures**

In the event the Master determines the employment of a shipboard crewmember may be terminated, whether for job performance or for disciplinary reasons, a Master's Hearing will be held before the crewmember is terminated and signs-off the ship.

**It is the Master's decision to hold a hearing based on available facts and interpretation of them, as presented in the Human Resources Manager's Report.**

The Human Resources Manager will prepare a "Report to Master", gathering all facts from the crewmember and any witnesses.  The Human Resources Manager will compile the crewmember's prior disciplinary record and crewmember's history with the company.

The Master Hearing must be attended by a Committee, which includes: Master, Staff Captain, Hotel Director or Chief Engineer, crewmember, Human Resources Manager, and the Division Head (Immediate Supervisor as needed).  The Master may request other persons to attend the Hearing at his/her discretion. The employee may elect to bring his/her own representative to the Master's Hearing.

At the hearing, the Master shall question the crewmember and any witnesses who might be able to provide information in the case.  The remaining members of the Committee may ask questions.  The Human Resources Manager will provide advice and counsel on any applicable collective bargaining agreements (CBA) and will act as an impartial party to the process, to ensure that the crewmember gets a fair and objective review of the circumstances.  The Master shall ask the Committee for their feedback before making a final decision.

When the Master makes a decision, he/she must inform the crewmember and state the ground for it.  The decision shall be entered on the Master's Hearing Form, as well as the crewmember and any witness's statements.  All in attendance must sign the form. In case of a dismissal, the Division Head will enter the termination into Encore/Enterprise-One before the crewmember departs the ship.

**Report to Master Form**


Report to Master - Blank.doc

### 6.08.02  Termination of a Concessionaire Crewmember

Crewmembers employed by the company's Revenue Partners, may be terminated through a Master's hearing due to policy violation. The Revenue Partner involved is responsible to address and correct any job performance issue of their employee through their company internal performance management system.

The following is the procedure for disciplinary actions taken with crew members working for any of our revenue partners (including: Starboard, Steiner, Onboard Media, Park West, Image, Australian Airbrush Tattoos) onboard Royal Caribbean International ships:

- For any disciplinary actions taken toward these crew members, both the Division Head (Marketing and Revenue Manager) and the Revenue Manager from the revenue partner company (e.g. Retail Manager, Spa Manager) must be informed and provided with copies of any documentation relating to the incident.
- Both the Division Head (Marketing and Revenue Manager) and Revenue Manager (e.g. Retail Manager, Spa Manager) must be invited to attend all disciplinary proceedings, including Master's Hearings relating to the incident.
- Following any disciplinary actions, the Revenue Manager will receive all related documentation and has the responsibility to forward all documentation to their shoreside HR departments.
- In the event that disciplinary action is taken against the Revenue Manager, the ship's M&R Manager will be responsible for contacting both the Account Manager for that revenue partner in the onboard revenue team, as well as the revenue partner's shoreside operations management.
- The Division Head (Marketing and Revenue Manager) will retain copies of all related documentation in their files for a minimum of 12 months.

Note:  Revenue Partners have the right to administer disciplinary action to their employees, up to and including termination. The decision to terminate a Revenue Partner employee by the Revenue Partner must be communicated by their shoreside management.  The Revenue Partner will request authorization for termination through Royal Caribbean International's Onboard Revenue Team by contacting their specific Account Manager.  Approval will be communicated to appropriate members of the ship's executive committee by the respective Manager of Onboard Revenue.

### 6.08.03  Reasons for a Master's Hearing

Terminations/Dismissals for employees onboard will go through Master's Hearing.  The Master can decide to dismiss an employee for two reasons:

6.08.03a  First, for *"Gross Misconduct"* , when an employee conducts a serious violation of company policies and/or rules and regulations.  Below are examples of violations that may be

considered serious enough for immediate dismissal, however, there may also be other instances leading to dismissal based on the Master's evaluation of actual circumstances.

- Violence against another person, guest or crew
- Smuggling, cooperating or failure to report narcotics traffic
- Dishonesty and /or falsification of company records
- Going to a guest cabin or taking a guest into crew area
- Misconduct towards a guest
- Possession of illegal weapons
- Sexual Harassment or Assault
- Theft of guest, crew or company property
- Violations of company drug and alcohol policy
- Use of another crewmember's crew card
- Arrested ashore for criminal offense
- Unauthorized use of company records
- Contravention of the "Save the Waves" program
- Missing or jumping ship
- Possession of unauthorized electrical appliances or candles
- Tampering with smoke detectors or other safety equipment
- Unauthorized use of galley equipment or cooking appliances

**6.08.03b** Second, the Master may dismiss any employee for ***"Unsatisfactory Job Performance"*** . This applies to an employee who has proceeded through the regular "Progressive Disciplinary Process (SQM, 6.07)" and is still not meeting the requirements for the position.

A Master's Hearing Form must be completed at the time of the hearing.  All in attendance must sign the form and the "explanation by defendant" must be filled.  The reason for dismissal, including the violation of the policy must be clearly stated on the form.  The HR Manager is responsible to prepare the Master's Hearing form and distribute copies upon conclusion of the hearing.

**Master's Hearing Form**

**6.08.04  Termination during Probation**

Newly hired employees are subject to a probation period in accordance with their Collective Bargaining Agreement (CBA) or personal employment agreement.  Termination can take place at **any time** during the probation period.

The Immediate Supervisor and the Division Head must provide documentation of Progressive Discipline previously issued to the employee, written recommendation to terminate employment and Performance Appraisal to the HR Manager.  The HR Manager and Department Head must approve the termination, notify the Master and give a letter of termination to the employee.

**Letter of Termination During Probation**

Human Resources - 6.08  (Revision 12 - 09/13/2007)

## 6.08.05  Termination by Shoreside Management

In special circumstances, corporate management may take disciplinary action up to and including termination of employment of shipboard employees.  The decision to dismiss can result from an employee serious violation of company policy or from an employee not showing enough improvement after a documented progressive discipline has taken place.

Termination for officers with 2 ½ stripes and above must be initiated in writing by the shoreside Director or Vice President of the functional unit, who will inform the Department Head shipboard.  The termination letter must be approved and signed by the Director of Fleet Employee Relations and Performance.

If the employee is onboard, the Department Head in collaboration with the HR Manager must inform the employee in person and give them the letter.  If the employee is not onboard, the termination letter must be mailed "registered" to the employee's home address on file.

In case of termination of employment of Out-Island Employees, the Site Manager of the out-island location will communicate to Shoreside Management the employee's violation. Depending on the severity of violation and steps taken within the progressive disciplinary process, the decision to terminate may be taken by the shoreside functional manager with approval of Fleet Employee Relations and Performance.  It is responsibility of the Site Manager to give the employee a termination letter.

The Termination letter should provide for 7 days notice or 7 days pay in lieu of notice.

## 6.08.06  Close Custody Guidelines for a Dismissed Employee

If a Master's Hearing results in an employee dismissal, the Immediate Supervisor must escort the dismissed shipboard employee from the Master's Hearing to the individual's stateroom accompanied by a Security Guards if deemed necessary.

The Supervisor must be present while the individual packs his/her belongings. It is the responsibility of the Supervisor to ensure the Shipboard Employee does not remove any company property from the vessel. Once all of the individual's belongings have been packed, the Supervisor will escort the Shipboard Employee to the Crew Office.

If the Shipboard Employee is not a US Citizen or Alien Resident Card holder, the Shipboard Employee's I-95 will be returned to the Crew Payroll Manager/Crew Purser.

The Supervisor will hand-over responsibility for the Shipboard Employee to the Security Officer. The Security Officer will accompany the dismissed shipboard employee while still onboard. The Security Officer should be advised when the Port Agent is ready to escort the dismissed shipboard employee from the ship. The Security Officer should arrange for the individual to be escorted to the crew gangway. The Port Agent will sign a receipt accepting responsibility for the

dismissed shipboard employee.

The Shipboard Employee must receive all outstanding wages before disembarkment.

November 14, 2007

# USEFUL ADDRESSES:

**Royal Caribbean International**
1050 Caribbean Way,
Miami, FL 33132, U.S.A.
PH: +1-305-539-6300
FX: +1-305-539-6168

**Norwegian Seafarers' Union**
Head Office
Post Box 2000 Vika
N-0125 Oslo, Norway
PH: +47-22 82 58 00
FX: +47-22 33 66 18
EM: firmapost@sjomannsunion.no
Visitors: Maritimt Hus
Rosenkrantz gate 15-17
Oslo, Norway

**Norwegian Seafarers' Union**
Miami Service Office
1001 North America Way, Room 101
Miami, FL 33132, USA
PH: +1-305-371-3120
FX: +1-305-371-2211
E-mail: nsumiami@nsu.org

**Fil-Nor GAIN**
Philippine Service Office
G/F ECJ Building, Real corner
Arsobispo St., Intramuros
Manila, Philippines
PH: +63-(0)2-405-0210
FX: +63-(0)2-405-0220
EM: filnor@info.com.ph

**Iriani Thamrin**
Indonesian Service Officer
c/o Bali Seamen's Club
Jl. D. Tamblingan No. 27
Sanur – Denpasar
Bali, Indonesia
PH: +62-361-283992
FX: +62-361-283914
EM: iriani_i@hotmail.com

34

November 14, 2007

The contents of this printed document are correct at the date of print but may be amended from time to time by mutual agreement of the Owners/Company and the Union. The latest updated version may be obtained from the Owners/Company and the Union respectively by request.

AGREEMENT BETWEEN ROYAL CARIBBEAN CRUISES LTD. AND NORWEGIAN SEAFARERS' UNION FOR MARINE OFFICERS AND DECK & ENGINE RATINGS AND RIDING CREW AND HOTEL PERSONNEL SERVING ON CRUISE VESSELS UNDER THE ROYAL CARIBBEAN INTERNATIONAL BRAND Effective January 1, 2008